**In re Dennis Dale CLOYD, Barbara Ann Cloyd, Debtors.**

**William L. LANCASTER, III, Trustee, Plaintiff,**

**v.**

**FIRST NATIONAL BANK OF GREENEVILLE, TENNESSEE, Defendant.**

**Bankruptcy No. 3–82–00648.**
**Adv. No. 3–82–0459.**

United States Bankruptcy Court,
E. D. Tennessee.

Aug. 31, 1982.

Margaret B. Fugate, Chattanooga, Tenn., for plaintiff.

G. P. Gaby, Greeneville, Tenn., for defendant.

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

The controversy between the plaintiff trustee and the defendant First National Bank of Greeneville, Tenn., (Bank) involves the purported substitution of collateral. Trial was held July 6, 1982.

### I

The debtor, Dennis Dale Cloyd, a farmer and cattle buyer and seller, borrowed money from the Bank on August 18, 1980, August 25, 1980, and October 30, 1980, the loans being evidenced by three notes secured by livestock, each note being secured by a different herd of livestock.[1] These notes were renewed periodically, the balance being reduced each time with the same security noted on the renewal notes. The undisputed testimony of the debtor is that the last renewals, dated November 2, 1981, November 2, 1981, and November 5, 1981, were *not* signed by him, although each note purportedly bears his signature.[2]

On March 17, 1982, the debtor executed a note to the Bank in the amount of $6,166.11. The proceeds of this note were paid to the Bank to retire the balances due on the three notes referred to heretofore. The March 17, 1982, obligation was secured by the assignment of a note payable to the debtor from Sanders Equipment Company.[3] The assignment is dated March 17, 1982, and was accepted by Sanders the same date. The Bank says at that time that it released its security in the cattle, substituting therefore the Sanders note.

---

1. The August 18, 1980, note was secured by "2 registered Angus cows with calves, 1 Angus cow and calf; 1 B/Hereford and calf, 2 B/Hereford Springers."

    The August 25, 1980, note was secured by "3 Springer Heifers approximately 700 pounds each, 2 cows approximately 1000 each."

    The October 30, 1980, note was secured by "10 Hereford Heiffers [sic] approximately 400 pounds each, 2 Black Face White Heiffers [sic] approximately 450 pounds each."

2. Although denying that he signed these particular notes, the debtor admits the genuineness of his signature on the other notes, including the note executed on March 17, 1982, discussed hereafter.

3. As the result of the "trading down" of equipment, Cloyd received a note from Sanders dated March 12, 1982, in the amount of $6,706.12, payable in eighty days.

Cloyd's bankruptcy petition was filed May 10, 1982. The trustee insists that the Bank discovered prior to the transaction of March 17, 1982, that the debtor had disposed of the cattle which secured the notes held by the Bank. The undisputed testimony of the debtor is that, shortly before the March 17th transaction, an employee of the Bank telephoned him and threatened to have him "picked up" by the sheriff if he did not do something about the debts owing to the Bank. He was able "to come up with something that was satisfactory to the Bank," that is, an assignment of the Sanders note. The debtor also testified, and this testimony is also undisputed, that the cattle which had been listed on the original notes had been sold or traded several months before the March 17th transaction and that he told Mr. Ken Horton at the Bank that the cattle had been sold. Mr. Horton had initially refused to renew the notes but agreed to the renewal when the Sanders note was pledged.

In addition to his farming operations, Mr. Cloyd testified that he bought and sold cattle. He had three registered Angus to die. On November 2, and November 5, 1981, the dates of the last renewals, he did not own the cattle listed as security on the three renewal notes[4] which were paid with the proceeds advanced by the Bank to him in consideration of the March 17, 1982 note.

## II

The trustee seeks to avoid the March 17, 1982, transaction as a preference, 11 U.S. C.A. § 547.[5]

---

[4] The debtor testified that the cattle either had been sold, traded, or had died prior to the November 1981 renewals—renewals which the debtor denies signing.

[5] (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

    (1) to or for the benefit of a creditor;

    (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

    (3) made while the debtor was insolvent;

    (4) made—

    (A) on or within 90 days before the date of the filing of the petition; or

Although conceding that the proof conclusively shows that Cloyd disposed of the cattle many months prior to the March 17th transaction, the Bank insists that the assignment of the Sanders note cannot constitute a preference, citing *Kenneally v. First National Bank of Anoka,* 400 F.2d 838 (8th Cir. 1968) *cert. denied,* 393 U.S. 1062, 89 S.Ct. 716, 21 L.Ed.2d 706 (1969). The Bank's defense can be summarized as follows:

(1) The transaction on March 17, 1982, was a substitution of collateral.

(2) The Bank's lien on the cattle, regardless of their whereabouts, was valid and perfected at the time the lien was released on March 17, 1982.

(3) The value of the cattle was sufficient to satisfy the debt of Mr. Cloyd to the Bank, regardless of where the cattle were or who owned them on that date.

(4) Mr. Cloyd received value for the release of the cattle, since he was released from his civil liability to the persons to whom he had sold the cattle.

## III

The critical issue as seen by this court is whether the transaction on March 17, 1982, was a substitution of collateral that did not result in a depletion of the debtor's estate. If so, the transaction would not constitute a preference under § 547.

"It is too well settled to require discussion that an exchange of securities within the four months [now three months] is not a fraudulent preference within the

---

    (5) that enables such creditor to receive more than such creditor would receive if—

    (A) the case were a case under chapter 7 of this title;

    (B) the transfer had not been made; and

    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

    . . . .

    (f) For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition.

11 U.S.C.A. § 547(b)(f).

meaning of the Bankruptcy Law, even when the creditor and the debtor knew that the latter is insolvent, if the security given up is a valid one when the exchange is made, and if it be of undoubtedly equal value with the security substituted for it."

*Sawyer v. Turpin,* 91 U.S. 114, 120, 23 L.Ed. 235 (1875).

■ The mere substitution of new security in the place of security for an old debt does not ordinarily create a preference because there is no diminution of the debtor's estate whereby the creditors may be injured. 4 Collier on Bankruptcy, ¶ 547.22 (15th ed. 1981). It is a different matter, however, when the transaction actually results in a depletion of the debtor's assets. In such a case, where the new security is of greater value than the old, a voidable preference for the difference in value between the two securities may result.

In *Foster v. Manufacturer's Finance Co.,* 22 F.2d 609 (1st Cir. 1927), the bankrupt, Sullivan, assigned about $60,000.00 of accounts receivable, designated specifically, to the Finance Company. About $49,000.00 of these were forgeries. Upon examining Sullivan's books, the Finance Company discovered the fraud and procured, by way of partial substitution for the forged accounts, assignments from Sullivan, of about $10,-000.00 of valid receivables. The court of appeals, reversing the district court which had reversed the bankruptcy court, held the transaction a preference, finding that the forged accounts were not part of the bankrupt's estate—they were nothing. "When Sullivan assigned valid receivables in substitution for forged receivables, he depleted his estate to that extent." *Id.* at 610.

In *Wolfe v. Bank of Anderson,* 238 F. 343 (4th Cir. 1916), Beatty, the bankrupt, had been involved with the Bank of Anderson for six years for the purpose of financing his business operation. Accounts receivable were assigned to secure Beatty's indebtedness to the Bank of Anderson. Each time one of Beatty's notes to the bank became due a renewal note would be executed and a new list of accounts would be furnished as security. There was a mutual understanding between the parties that Beatty would be permitted to use the money from the assigned accounts to either reduce the claim of the bank or apply in the operation of his business.

On October 21, 1915, the bank held two notes in the respective amounts of $6,000.00 and approximately $2,600.00. These notes were secured by accounts in the aggregate amount of $5,051.27. Payment in an amount sufficient to reduce the indebtedness on the smaller note to $1,263.00 was made on February 19, 1916. A renewal note was executed in that amount. The accounts assigned amounted to $4,167.18 when the renewal note for the smaller of the two unpaid notes were executed. The bank knew that Beatty was insolvent when the renewal note was executed on February 19, 1916. In fact, the bank had known long before that date that Beatty was insolvent. Beatty was adjudicated a voluntary bankrupt on March 16, 1916.

The court noted that the February 19, 1916, transaction could not be upheld against the trustee in bankruptcy unless there was "an actual substitution of new accounts for those which the bank then held, and had the right to hold because they were acquired in good faith more than four months before the petition in bankruptcy was filed." *Id.* at 345.

Since Beatty had been permitted to collect the accounts assigned to the bank in October of 1915 and use the money as he saw fit, those accounts were not in existence when an assignment of accounts was given on or about February 19, 1916. "When the transfer took place, the bank had nothing to surrender, for the October accounts had ceased to exist. Obviously there could be no substitution, unless the Bank then held something to exchange, and that was not the case." *Wolfe,* 238 F. at 345. The February 19, 1916 transaction was thus determined to be a voidable preference.

■ In the instant case, as in *Wolfe,* the Bank did not have anything to surrender,

other than a cause in action. Cloyd apparently disposed of the Bank's collateral and utilized the proceeds as he saw fit. Granted, although Beatty was apparently authorized to use proceeds from the accounts as he elected and Cloyd may not have been similarly authorized, the fact remains that the estate was diminished by the assignment of the Sanders note to the Bank without a corresponding receipt of value by the estate of the debtor.

Under the undisputed facts in the case before this court, the cattle, on the date of the transfer of the Sanders note to the Bank, were not and for many months had not been a part of the debtor's estate. The cattle had either been sold, traded, or had died. The transfer of a $6,706.12 note for release of a security interest in property that the debtor did not have and no longer legally owned inescapably depleted his estate. It may be true, as it insists, that the Bank could have pursued its remedies against the sold or traded cattle.[6] The Bank knew that the debtor no longer had possession of the cattle, but instead of pursuing its lien rights against the cattle, the Bank elected to accept new collateral in the form of the Sanders note. Clearly, the substitution of collateral of equal value would not have depleted the debtor's estate and would not have constituted a voidable preference. But those are not the facts in the instant case. There was no "new value" flowing to the debtor's estate.[7]

The Bank initially relied upon *Kenneally v. First National Bank of Anoka, supra,* but in a Supplemental To Defendant's Memorandum Brief, filed August 10, 1982, the Bank conceded that *Kenneally* does not represent concrete authority for the Bank's position.

The court finds that the transfer on March 17, 1982, depleted the debtor's estate by the amount of the transfer. Further, the court finds that all elements of a pref-

erence required by § 547(b) have been established by the trustee. It follows that the transfer must be avoided as a preference.

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 752.

---

6. The record is silent as to whether the Bank held a perfected security interest in the cattle that would enable them to reclaim from the purchasers.

7. It may be that the Bank's decision not to have him picked up by the sheriff, after he substituted the note for the cattle which he no longer owned, may have resulted in some personal benefit to Cloyd. But, it certainly did not benefit either his estate or other creditors.