Harry G. HAGER, Plaintiff–Appellant,

v.

Ruth A. GIBSON, Trustee for Preference, Ltd., Defendant–Appellee.

No. 95–2575.

United States Court of Appeals, Fourth Circuit.

Argued Sept. 25, 1996.

Decided March 19, 1997.

---

202

**ARGUED:** Frank James Santoro, Marcus, Santoro & Kozak, P.C., Portsmouth, VA, for Appellant. Alvin Powers Anderson, Anderson, Franck & Davis, P.C., Williamsburg, VA, for Appellee. **ON BRIEF:** Karen M. Crowley, Marcus, Santoro & Kozak, P.C., Portsmouth, VA, for Appellant. Ruth A. Gibson, Norge, VA, for Appellee.

Before LUTTIG and MICHAEL, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

Affirmed in part and reversed in part by published opinion. Senior Judge PHILLIPS wrote the opinion, in which Judge LUTTIG and Judge MICHAEL joined.

## OPINION

PHILLIPS, Senior Circuit Judge:

In this corporate bankruptcy proceeding, the Trustee sought recovery from Dr. Harry Hager, a fifty percent shareholder in the corporate debtor, of certain sums allegedly recoverable under the preference-avoidance and turnover provisions of the Bankruptcy

Code, or under state common law. The bankruptcy court granted summary judgment as to the entire amount claimed and the district court affirmed its judgment without any discussion. On Dr. Hager's appeal, we affirm in part and reverse in part.

## I.

In 1987, Donald J. Roop and his wife, Sandra Roop, incorporated Preference, Ltd. under Virginia law to operate an Orvis retail establishment in Colonial Williamsburg. Each owned fifty percent of the shares at incorporation. The Roops divorced after the incorporation, and Hager purchased Mrs. Roop's shares for $150,000. At all times relevant to this appeal, Hager has owned fifty percent of the Preference stock and Roop has owned the remaining fifty percent of stock and been Preference's president.

When the Roops formed the corporation, they obtained from Crestar Bank (Crestar) a running line of credit under a demand promissory note for $150,000 ("the note") which contained a security agreement pledging Preference's assets as collateral and which the Roops personally guaranteed. In usual line-of-credit terms, the note provided that the principal plus accrued interest would be due on demand, "but [Preference] shall be liable for only so much of the Loan Amount shown above as shall be equal to the total advanced to or for the undersigned ... less all payments made by or for the undersigned and applied by the Bank to principal...." JA at 115. When Hager purchased Mrs. Roop's shares, Crestar released Mrs. Roop from the guarantee but required Hager to guarantee the loan personally.

Over time, Preference's financial situation worsened and Roop and Hager's personal relationship deteriorated. By late 1992, Hager and Roop were only communicating through their attorneys. Crestar, having learned of Preference's difficulties, demanded immediate payment of the note and pressured Hager by threatening to invoke his personal guarantee.

When he purchased his shares in the company, Hager had not intended to be involved in the day-to-day operations of the retail establishment. In the months leading up to Crestar's demand for immediate payment, however, Hager had assumed control of the store under an October 1992 agreement with Roop that anticipated closing the business. A part of the agreement was that "Preference[ ] will be managed using a sole checking account that requires all checks drawn to be signed by both Dr. Hager and Mr. Roop." JA at 126. When, following the agreement, Hager accused Roop of taking money from the establishment for his own purposes, Hager changed the locks on the doors to prevent Roop's entry. On December 15, 1992, Hager gave written notice of his resignation as a director of Preference. On December 18, Hager's attorney wrote to Roop's attorney suggesting that the business might be restored to solvency without resorting to liquidation. JA at 128–29. On December 30, however, Hager's attorney advised Roop's attorney that because Crestar had demanded immediate payment on its loan and had threatened to invoke Hager's guarantee of the loan, Hager was unilaterally revoking the ground rules upon which the two principals had agreed, apparently including the requirement that Preference's checks have the signatures of both Hager and Roop. JA at 130.

On the same day, Hager purchased in his own name the Crestar note on which there was then an outstanding balance of $129,764.04. In payment, Hager gave Crestar two checks: one drawn on Preference's account in the amount of $40,000 and one on Hager's personal account for $89,764.04. Upon receipt of the checks, Crestar "assign[ed] and transfer[red] to [Hager] all rights conferred and duties imposed upon Crestar Bank under the terms of a certain promissory note...." JA at 133. The assignment made no express reference to the security agreement, which was located in a separate section of the note. Later, on February 1, 1993, at Hager's request, Crestar and Hager executed an "amendment" to their December 30, 1992 assignment which affirmed their intention that the assignment include the security interest. JA at 146–47.

Immediately following his purchase of the Crestar note, Hager closed the store to regular business and set about liquidating the

corporation's assets, which apparently consisted only of the store's inventory. Though Roop's attorney had suggested to Hager that the inventory be sold back to Orvis, who would have credited the corporation for the value of the merchandise minus a ten percent restocking charge, Hager had declined to do so. Selling the inventory back to Orvis would have involved apportioning the proceeds to other creditors, a result at odds with his plan to use them in payment of the Crestar note he was to purchase. JA at 152–53. Instead, acting unilaterally on the claimed belief that "[once] I paid the note, ... [e]verything in the building belonged to me," and that he would then no longer owe any duty to the corporation or to Roop, Hager undertook to liquidate the assets on his own. JA at 153–54. To this end, he employed a liquidation firm to assist him and, in addition to selling some of the inventory in regular retail sales from the store premises, advertised a special liquidation sale of the remaining assets to be held on store premises on January 21–23, 1993. Noticing the advertisement, Preference's landlord, the Colonial Williamsburg Foundation (Foundation), filed a petition for Distress of Rent in Virginia state court, demanding $38,852.60 and seeking to enjoin the sale. In order to allow the sale to proceed, Hager and the Foundation entered into a written escrow agreement which provided, "All proceeds from the Sale are to be tendered to Troy Titus, Esq .... to be placed in his trust account ... pending further order of the General District Court of the City of Williamsburg." JA at 137. The state court then permitted the liquidation sale to proceed on the condition that the proceeds be deposited in accordance with the escrow agreement. The agreement also provided that it could "not be modified or amended and the observance of any term ... may not be waived without the prior written consent of all parties hereto," or it shall "terminate upon the discretion of the court." JA at 138. Though Hager later claimed in deposition testimony that the judge "thr[ew] out" the rent distress action, JA at 165, the record contains no indication that the court filed any orders after the sale was allowed to proceed.

The liquidation sale yielded $32,020.66 in cash sale proceeds and $43,423.66 in credit card sale proceeds. The cash sale proceeds of $32,020.66 were deposited in the Escrow Account, but the credit card sale proceeds of $43,423.66 were deposited in Preference's account. On February 28, 1993, Hager drew a check on the Preference account, payable to himself for $43,423.66, the amount of the credit card sale proceeds, and on April 17, 1993, Titus drew a check on the Escrow Account, payable to Hager, for $32,020.66, the amount of the cash sale proceeds. The Foundation has not received any of the liquidation sale proceeds and no further monies have been deposited in the Escrow Account. In all of these actions, Hager acted unilaterally, giving no formal notice either to the corporation or to Roop, still officially its president.

On April 26, 1993, Roop, acting as president and on the ostensible authority of a corporate resolution, filed a voluntary petition for bankruptcy on behalf of Preference. In December of 1993, Ruth Gibson, the trustee in bankruptcy ("the Trustee") made written demand on Hager that he turn over to her all proceeds from liquidation of the corporate assets and the $40,000 from Preference's bank account that he had used in purchasing the Crestar note. When by August 18, 1994, Hager had made no response to the demand, the Trustee brought this adversary proceeding against him. On December 20, 1994, Hager moved to dismiss the bankruptcy case and all related adversary proceedings.

From the outset, procedural confusion has plagued the Trustee's adversary proceeding against Hager. Because that confusion significantly affects our disposition of the appeal, we recite the procedural history in some detail.

The Trustee's complaint, essentially alleging the facts above recited, claimed a right to recover from Hager "all funds represented by checks drawn on [Preference] after October 9, 1992, without the signatures of both [Hager and Roop]; all funds received [by Hager] directly or indirectly from [the liquidation firm] representing the proceeds of the liquidation sale ...; [and] all funds received

and/or held and/or disbursed in connection with [the] Escrow Agreement." JA at 17. Entitlement was claimed generally under 11 U.S.C. § 363 (trustee's right to estate property), § 542(a) (turnover), § 547(b) (prepetition transfer), and under Virginia statutory law respecting director conflicts of interest. Specific amounts claimed were not identified, nor related to particular sources of claimed right.

On December 20, 1994, following discovery, the Trustee moved for summary judgment. Relying on facts asserted to be now undisputed, the Trustee became somewhat more specific in her motion and supporting memoranda in identifying the legal bases for and the exact amount of her claim. Invoking both the turnover provisions of § 542(a) and the transfer avoidance "preference" provisions of § 547(b), the Trustee claimed entitlement as a matter of law to the $40,000 applied by Hager to purchase the Crestar note, the $43,423.66 deposited by Hager to his account out of the liquidation cash sale proceeds, and the $32,020.66 representing the credit card sale proceeds paid to Hager out of the Escrow Account. In addition, the Trustee claimed entitlement to an "avoidance" of Crestar's assignment of its security interest to Hager by the February 1, 1993 "amendment" of its assignment of the Note, as an avoidable preference under § 547(b). And, abandoning specific reliance on the Virginia conflict-of-interest statute identified in her complaint as an alternative basis for her overall claim, the Trustee now invoked instead a general (presumably state common law) breach of fiduciary duty theory as an alternative ground of recovery. JA 25–39, 51–69.

Though the Trustee's specific legal positions respecting the three separate sums claimed was not too clear from her summary judgment motion and supporting memoranda, the widest possible reading consistent with the undisputed chronology of events would seem to be as follows. The Trustee was entitled to recover both the $40,000 used by Hager in partial payment (and purchase of) the Crestar note, and the total of $75,444.32 realized from the liquidation sale, a grand total of $115,444.32, under either or both the turnover provisions of § 542(a), the preference avoidance provisions of § 547(b), and state common law. Specifically, entitlement was claimed under § 542(a) to delivery by Hager of property of the estate in his possession which the Trustee might "use" under § 363; under § 547(b), to avoid transfers of estate property to Hager within the relevant time periods that enabled Hager to receive more than he would have received as a (secured or unsecured) creditor in a Chapter 7 proceeding; and under state law, to recover property of the estate used by Hager for his own benefit in breach of his fiduciary duty as shareholder in a closely held corporation. JA 25–35 (motion); 36–39 (supporting memorandum); 51–68 (supplemental memorandum).

Hager's opposition to the Trustee's motion for summary judgment was two-pronged. The primary position was that, as a matter of law, his purchase of the Crestar note and security interest on December 30, 1992, made him a secured creditor of Preference for the note balance as reduced by payment of $40,000 on Preference's account. As such, his later realization of the proceeds of the liquidation sale of his own collateral did not constitute an avoidable preference under § 547(b). This entitled him rather than the Trustee to judgment as a matter of law. In a fall-back position, he contended that there were genuine issues of material fact respecting both his status as an "insider" for purposes of the pre-petition preference period and as a secured creditor for preference purposes that precluded summary judgment on the record before the court. And, erroneously asserting that the Trustee only sought recovery under the preference provisions of § 547(b), he declined to address the other grounds raised. JA 48–50.

On January 6, 1995, following a hearing on the motion, Bankruptcy Judge Bonney deferred ruling upon it, indicating that he would take the motion under advisement and that the parties might submit additional materials and memoranda until January 25.

At a hearing held on January 20 to consider Hager's intervening motion to dismiss the petition for lack of jurisdiction, Judge Bonney not only ruled orally on that motion,

denying it,[1] but surprised the parties by also ruling orally on the summary judgment motion. In relevant part, he ruled that

> [U]nder 547(b) ... the motion for summary judgment relative to Preference (sic) ["preference"?] should be granted.... [I]nsider was shown and the elements ... in 547(b) for Preference (sic) were met by [the summary judgment] exhibits.
>
> Now, 542(a), while there were fiduciary duties not used in that statute, it was argued considerably that that's what was involved here. A fiduciary duty, of course, is something more intangible, and the Court would hesitate to grant summary judgment on such an issue.... So the Court denies the Motion for Summary Judgment under § 542(a).

JA 210–11.

When, following this oral ruling, the parties reminded the judge that he had given them until January 25 to submit supporting memoranda, the judge agreed to consider the documents, reconsider his decision, and reduce to writing his opinion. JA at 216. Confusion now mounted.

On February 22, Judge Bonney wrote to the parties: "On January 20, 1995, I announced from the bench my decision regarding the plaintiff's Motion for Summary Judgment. That decision stands. The question was raised as to the amount the plaintiff would be entitled to. I am of the opinion it would be $115,444.32 [the total claimed]." JA at 223. The judge then instructed the Trustee's counsel to prepare a proposed order.

Counsel did so, but before it could be submitted to Judge Bonney, he had retired and it was submitted instead to Bankruptcy Judge David H. Adams to whom the case had then been assigned. As submitted, its operative provisions read:

> "[T]he court doth make findings of fact in strict accordance with numbered paragraphs 1 through 44 on pages 6 through 12 of the Plaintiff's Memorandum.... The Court doth ADJUDGE, ORDER and DECREE that Ruth A. Gibson, Bankruptcy Trustee for Preference, Ltd. have judgment against Harry G. Hager in the amount of [$115,444.32] for the reasons set forth in the Plaintiff's Memorandum."

JA at 221. On March 15, 1995, Judge Adams entered the order in the form submitted by counsel without any further hearing or submissions by the parties. Hager asserts, and the Trustee does not deny, that the order was not submitted for Hager's consideration before its entry by Judge Adams. Hager then timely noted appeal to the district court from the order granting summary judgment to the Trustee.

On August 8, 1995, following submission and consideration of written briefs, the district court entered an order that affirmed both the bankruptcy court's denial of Hager's motion to dismiss and its grant of summary judgment to the Trustee. In a ten-page Order and Opinion, the district court, while formally recognizing that Hager's appeal was from both orders, only discussed and gave reasons for affirming the order denying Hager's motion to dismiss for lack of jurisdiction. Though the parties had extensively briefed the summary judgment issues, the court's opinion gave no rationale for the ultimate unelaborated affirmance of the summary judgment order and, indeed, no indication that the issues had been considered by the district court de novo.

Hager then appealed to this court from the order affirming the bankruptcy court's grant of summary judgment.

## II.

### A.

At the outset, we face a problem in determining just what is properly before us for review. To recapitulate briefly the procedural confusion that creates that problem, we start with the bankruptcy court's cryptic order of March 15, 1995. That order, as entered by Judge Adams, simply granted summary judgment for $115,444.32, the full amount finally claimed by the Trustee, and referred for both its "findings of fact" and its

---

1. On Hager's appeal from that order, the district court affirmed, 188 B.R. 194 (E.D.Va.1995), and we in turn have earlier affirmed the district court's decision upholding jurisdiction. 108 F.3d 35 (4th Cir. 1997).

legal "reasons" to the "Plaintiff's Memorandum" (actually, the Plaintiff's Supplemental Memorandum in Support of Motion for Summary Judgment). JA 51–68, 221. When that Memorandum is then consulted for the legal basis upon which summary judgment was granted, it reveals, see Part I, supra, that recovery was being sought by the Trustee alternatively under both the turnover provisions of § 542(a), the preference provisions of § 547(b) and under state law fiduciary duty principles.[2] If it then be considered that summary judgment was granted, as sought, on all three grounds in the alternative, the order is at odds with Judge Bonney's previous oral ruling which was the order's purported basis but which seemingly found summary judgment warranted only with respect to sums avoidable as preferences under § 547(b), and expressly found summary judgment on state law fiduciary duty grounds unwarranted because of material factual issues. JA 210–11.

This confusion as to the exact legal basis upon which summary judgment was granted for particular sums by the bankruptcy court is then compounded by the district court's failure to indicate any legal basis for its affirmance of the bankruptcy court's order. We therefore have a record which is not clear as to the legal basis upon which any of the three judges who have ruled in the Trustee's favor for the full amount of her claim have done so. Under some circumstances, the resulting uncertainty might require or warrant a remand for first instance reconsideration and clarification of the judgment being appealed. Here, however, that is neither required nor necessary. Because the record reveals all the grounds urged by the Trustee for the award in the bankruptcy court, the issues raised by Hager in challenging the award on this appeal, and the alternative grounds urged by the Trustee for its affirmance by this court, and because we review de novo the bankruptcy court's grant of summary judgment as affirmed on de novo review by the district court, see In re Ballard, 65 F.3d 367, 370 (4th Cir.1995), the record suffices to define the issues properly presented for our review and to permit their fair de novo review and resolution.

B.

We first identify those issues.

In challenging the judgment, Hager as appellant raised two issues, actually an issue and a sub-issue, in his main brief. The issue in paraphrase, was whether any of the sums in question—the $40,000 used to pay down and purchase the Crestar note and the two sums totalling $75,444.32 realized from the liquidation sale—were, as a matter of law, avoidable transfers under § 547(b). The sub-issue, essentially determinative of the main issue in regard to the liquidation sale proceeds, was whether at the time of the liquidation sale, Hager was a secured creditor. Appellant's Brief at 4. So confining his challenge, Hager contended that as a matter of law on the undisputed facts respecting these three sums, none was an avoidable transfer recoverable under § 547(b). In thus limiting the basis of his challenge, Hager contended that this was the only legal basis relied upon by the bankruptcy court, since it was the only announced basis for Judge Bonney's oral ruling on which the order entered by Judge Adams and affirmed without discussion by the district court was necessarily based.

In response, the Trustee contended that a consideration of the entire course of proceedings showed that the bankruptcy court's

2. The Trustee has shifted ground over the course of the proceedings as to the specific legal bases for her claims to the sums at issue. In her original memorandum in support of the motion for summary judgment, she sought recovery of the $40,000 note purchase proceeds under the preference provisions of § 547(b) by invoking the one-year preference period provisions of § 547(b)(4)(b) on the basis that Hager was an "insider" at the time he drew that check. JA 38. In her later supplemental memorandum, however, she rested her claim to the $40,000 only on the turnover provisions of § 542(a) and state law fiduciary duty principles. JA 65, 67–68. Similarly, in her adversary proceeding complaint, she relied on state statutory law, Va.Code §§ 13.1–690, 691 (1995), respecting corporate director conflicts of interest as the legal basis for her state law claims to all the sums in issue, JA 16, but in her supplemental memorandum she had dropped reliance on these state statutory provisions and rested her state law claim on common law fiduciary duty principles. JA 67–68.

judgment for the entire $115,444.32 necessarily was based in part on grounds other than § 547(b) preference. Because recovery of the $40,000 that was necessarily included in the total had not been sought on a § 547(b) preference theory but only under the turnover provisions of § 542(a) or state fiduciary duty principles, that portion of the judgment must have been based on one or both of those rather than on a preference theory. And, because recovery of the total of $75,444.32 realized from the liquidation sale had been sought, per her memorandum, on all three theories, that portion of the judgment might properly have been based not only on preference grounds but on either or both of the other two. Accordingly, Hager's challenge to the judgment could not succeed if limited only to § 547(b) preference grounds. Appellee's Brief at 22–24 (summary of argument).

Confronted with this position, Hager, though standing on his principal contention that the award could only be assessed under the preference provisions of § 547(b), took a fall-back position in his reply brief. If any portion of the award were considered to have been based upon either the turnover provisions of § 542(a) or state fiduciary-duty law, he contended that neither supported it as a matter of law. Appellant's Reply Brief at 7–12.

■ In view of the procedural confusion we have recited, Hager's insistence that the only discernible legal basis for the summary judgment award by the bankruptcy court is the avoidable transfer provisions of § 547(b) is understandable. But, even if that were so (a matter, frankly, impossible to determine), it would be of no moment in identifying the basis upon which we, in de novo review, must assess the propriety of the award. For even so, the Trustee, as appellee, would be entitled also to urge as a basis for affirmance of the summary judgment any alternative ground that she urged as a basis for the judgment in the bankruptcy court. *See Ross v. Communications Satellite, Corp.,* 759 F.2d 355, 363 (4th Cir.1985). And, as indicated, though the Trustee's submissions in that court were not the clearest, they unmistakably included all three legal theories as alternative grounds for recovery of the liquidation sale proceeds and both the turnover provision of § 542(a) and state fiduciary duty principles as alternative grounds for recovery of the $40,000 note-payment sum. We must, therefore, assess the propriety of the grant of summary judgment under all of the legal theories ultimately urged by the Trustee as alternative grounds for particular portions of the total sum sought and awarded.

This means that we must consider whether the bankruptcy court's grant of summary judgment was proper as to the $75,444.32 in liquidation sale proceeds under either the turnover provisions of § 542(a), the avoidable preference provisions of § 547(b), or state law fiduciary duty principles, and whether it was proper as to the $40,000 note payment sum under either the turnover provisions of § 542(a) or state law fiduciary duty principles.

### III.

#### A.

We first consider whether the grant of summary judgment as to the $75,444.32 in liquidation sale proceeds was warranted under the avoidable preference provisions of § 547(b), and conclude that it was.

Section 547(b), in relevant part, provides:

(b) Except as provided in subsection (c) . . ., the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of the creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables the creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b) (1994). Hager has conceded that the two transfers to him of liquidation sale proceeds meet all the requirements of this section except subdivision (5). Appellant's Brief at 14. As to that requirement, he contends that at the time of these transfers, he was a secured creditor of Preference by virtue of his December, 1992, purchase of the Crestar note and its incorporated security agreement. As such, he argues that he did not, per § 547(b)(5)(A–C), receive more by these transfers than he would have if the case were one under Chapter 7, the transfers had not been made, and he had received payment of the debt to the extent provided in a Chapter 7 liquidation. Therefore, under § 547(b)(5), the transfer to him of these proceeds did not constitute avoidable preferences.

The Trustee counters that (1) Hager's use of $40,000 from the Preference's bank account in partial payment and purchase of the Crestar note "tainted" any security interest he acquired by its purchase; (2) in any event, he did not acquire the security interest when the note was assigned to him on December 30, 1992, but only when the assignment was amended on February 1, 1993, after the liquidation sale had occurred, to affirm its intended original inclusion of the security interest; and (3) in any event, even if he was a secured creditor at the time of the liquidation sale, his entry into the escrow agreement respecting disposition of the sale proceeds insured that in a Chapter 7 proceeding he would not have realized as much, given the landlord's contractual claim, as he did by simply taking the entire proceeds in violation of the landlord's rights under the state court order approving the escrow agreement.

We take these in order.

■ On the first point, the Trustee's "taint" theory—as we understand it—depends on the amount of the debt assigned upon the note's purchase, hence the value of the interest in any collateral securing that debt. That interest would only be "tainted" under the Trustee's theory if the debt it secured was for the full amount, $129,764.04, paid to Crestar incident to the note's purchase and assignment to Hager. But that is not the case. The $40,000 paid on Preference's account out of its funds reduced the balance it then owed on the Crestar note by that amount. What Hager then purchased with his own check for $89,764.04 was a note worth only that reduced amount that was secured by collateral that could be realized only up to that amount. That debt and security interest, having been purchased entirely by Hager's own funds, was not "tainted" by the use of Preference funds to reduce its value in Hager's hands as a secured creditor.

■ On the second point, the time at which Hager acquired the security interest, we are satisfied that under Virginia law, the note assignment of December 30, 1992, carried with it the security interest incorporated in the note, though it was not expressly mentioned in the assignment. The note was a negotiable instrument under Va.Code Ann. § 8.3A–104(a) (Michie Supp.1996). As such, its transfer by assignment to Hager on December 30, 1992, constituted him a holder in due course and vested in him "any right of the transferor to enforce the instrument." Va.Code Ann. § 8.3A–203(b) (Michie Supp. 1996). Among these were the rights conferred by the security interest which clearly was then held by Crestar. The later "amendment" to the assignment confirming the original intention to assign the security interest was not required to make the assignment of December 30, 1992 effective for that purpose.

Nevertheless, we conclude that even if Hager was a secured creditor at the time of the liquidation sale of the collateral covered by the note, his entry into the escrow agreement created contractual obligations respecting the sale proceeds which took him out of the protections afforded by § 547(b) against certain preferential transfers.

■ Section 547(b)(5) does not give automatic protection to all secured creditors who receive preference-period pre-petition payments on their secured loans; indeed, "se-

cured creditors" are not mentioned as such in this provision. Rather, it protects only those creditors, secured or unsecured, who can establish that they received no more by the payment than they would have received as claimants in a Chapter 7 liquidation. This simply carries out "the common sense notion that a creditor need not return a sum received from the debtor prior to bankruptcy if the creditor is no better off vis-a-vis the other creditors of the bankruptcy estate than he or she would have been had the creditor waited for liquidation and distribution of the assets of the estate." *In re Virginia–Carolina Financial Corp.*, 954 F.2d 193, 199 (4th Cir.1992). Secured creditors paid out of collateral proceeds will usually meet the § 547(b) conditions because of the primacy of secured claims against the estate, but not necessarily. Whether one does in a particular case depends upon the circumstances that would determine the amount he would receive in a Chapter 7 liquidation in relation to the amount actually received by the challenged transfer.

█ Here, we are satisfied that in a Chapter 7 liquidation proceeding, Hager would not have received the full amount of the proceeds from the liquidation sale that he actually received. By entering into the court-ordered escrow agreement upon which the court conditioned the sale, Hager subordinated his right to the entire proceeds to the landlord's provable claim for back rent. A bankruptcy court, liquidating the estate under Chapter 7, would be bound to enforce the landlord's provable claim as against Hager's otherwise preferred claim to the whole of the proceeds. Hager does not dispute that back rent in some amount was owed the landlord. In consequence, he received more by taking the entire proceeds from sale of his collateral than he would have received, though as a secured creditor, in a Chapter 7 proceeding. Accordingly, the Trustee is entitled under § 547(b) to avoid the transfer of the liquidation sale proceeds to Hager.[3]

## B.

█ We next consider whether the Trustee is entitled under the turnover provisions

of § 542(a) to recovery of the $40,000 drawn by Hager, while managing the business, from Preference's bank account and applied in partial payment of the Crestar note. We conclude that she is not.

Section 542(a) provides in relevant part that:

> Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

Hager contends that this section does not authorize recovery of the $40,000 applied in payment of the Crestar note because he was not, when the adversary proceeding was brought, "an entity in possession, custody, or control during the case" of that property. We agree. Present possession, either actual or constructive, of the property or its identifiable proceeds, by the person from whom its turnover is sought, is required for recovery under this section. *See Maggio v. Zeitz*, 333 U.S. 56, 64, 68 S.Ct. 401, 405–06, 92 L.Ed. 476 (1948) (applying pre-code judicially developed turnover principles in so holding); *In re Sun Spas by Schaeffer, Inc.*, 122 B.R. 452, 455 (Bankr.M.D.Fla.1990); *In re Gailey, Inc.*, 119 B.R. 504, 514 (Bankr.W.D.Pa.1990). Here, the Trustee contends that Hager was in possession of proceeds of the $40,000 when the adversary proceeding was brought by virtue of his ownership of the Crestar note partially purchased with that sum. But, as we have previously pointed out, that misstates the nature and effects of that transaction. Rightly analyzed, the $40,000 was applied to reduce Preference's indebtedness on the note, thereby reducing the balance owing upon it, hence its value upon Hager's then purchasing it from Crestar with his own check for the balance remaining. Hager

---

3. Having so decided, we need not consider whether the liquidation sale proceeds might be recoverable under the turnover provisions of § 542(a) or state law fiduciary principles.

therefore has not possessed either the $40,-000 or any proceeds from its use as a result of that transaction and may not for that reason be required to turn the sum over under § 542(a).

■ The Trustee suggests various forms of chicanery on Hager's part in paying down the note with this sum. Hager of course paints a quite different picture of simply doing the best he could to salvage what he could of a enterprise from which Roop had simply walked away leaving him to pick up the pieces. But what might be the proper characterization of Hager's conduct is of no moment to § 542(a)'s application under the undisputed facts of this case. As the Supreme Court put it in applying the precursor turnover principle in *Maggio:* "[T]he primary condition of relief [by turnover] is possession of existing chattels or their proceeds capable of being surrendered by the person ordered to do so.... Conduct which has put property beyond the limited reach of the turnover proceeding may be a crime, or, if it violates an order ..., a criminal contempt, but no such acts, no matter how reprehensible, *warrant issuance of an order which creates a duty impossible of performance....*" *Maggio,* 333 U.S. at 63–64, 68 S.Ct. at 405–06.

## C.

Finally, we consider whether as a matter of law on the summary judgment record, the Trustee was entitled, under state law fiduciary duty principles, to recover the $40,000 in issue. We conclude that she was not, and that as a matter of law, her claim on that basis fails.[4]

As earlier indicated, *see* note 2 ante, the Trustee's state law claim for recovery of this and the other sums in issue has shifted in legal theory over the course of the proceedings. As originally pleaded, it was based on Virginia statutes, Va.Code Ann. §§ 13.1–690, 691 (Michie 1995), dealing with corporate director conflicts of interest. That theory, however, was abandoned at the summary judgment stage, presumably because of the evidence that at the times in issue, Hager had resigned as a director of the corporation. As finally advanced both in the courts below and on this appeal, the claim has been grounded, so far as can be told, in common law fiduciary duty principles. A single decision, *In re Dearborn Process Service, Inc.,* 149 B.R. 872, 880 (Bankr.N.D.Ill.1993) (applying Illinois law), is relied upon by the Trustee as recognizing fiduciary duties between shareholders of closely held corporations. For facts showing a breach of fiduciary duty with respect to the $40,000 sum, the Trustee points only to Hager's status as a fifty-percent shareholder in the closely held debtor corporation, his unilateral conduct in paying down and purchasing the Crestar note, denying Roop access to the business premises during his period of management, and taking the liquidation sale proceeds in violation of the escrow agreement. Appellee's Brief at 33.

■ Assuming, without deciding (having been referred to no authority) that Virginia law also recognizes the existence of fiduciary duties on the part of shareholders in closely-held corporations to each other and to the corporation, the facts relied upon by the Trustee to demonstrate a breach of that duty by Hager as to the $40,000 simply do not suffice. As earlier pointed out, Hager's application of this sum to pay down the corporate indebtedness on the Crestar note caused

---

4. We note, but pass as not relevant in view of our decision, a possible technical problem concerning the basis upon which this state law claim is asserted by the Trustee. If sought to be brought under the turnover provisions of § 542(a) (as may appear from the record) it would present serious problems of that section's applicability. *See Charter Crude Oil Co. v. Exxon Co., U.S.A. (In re Charter Co.),* 913 F.2d 1575, 1579 (11th Cir. 1990) (holding that turnover proceedings should not be used to liquidate disputed claims); *National Enters., Inc. v. Koger Partnership, Ltd. (In re National Enters. Inc.),* 128 B.R. 956, 959 (E.D.Va.1991) (same). If asserted as a free-standing tort claim brought by the Trustee under 11 U.S.C. § 323(b) (1994), it would create serious problems of the bankruptcy court's jurisdiction to entertain it as a non-core related proceeding. *See Diamond Mortgage Corp. of Illinois v. Sugar,* 913 F.2d 1233, 1239 (7th Cir.1990) (holding that a claim alleging breach of fiduciary duties was a non-core related proceeding); 28 U.S.C. § 157(c)(1) (1994) (providing that bankruptcy courts may hear non-core related proceedings, but shall present proposed findings of fact and conclusions of law to the district court for final resolution).

no injury to the corporation—which is the entity in whose behalf the Trustee brings this adversary proceeding—and conferred no personal financial benefit on Hager.

This is so because Crestar, having earlier called its note, was then entitled to the $40,000 as proceeds of the sale of its collateral. Under the note's terms, Crestar then had a security interest in Preference's inventory and proceeds. JA 131. The Virginia UCC defines "proceeds" to include whatever is received upon the sale of collateral. Va.Code § 8.9–306(1). Hager's application of the $40,000 to reduce the note balance therefore did no more vis-a-vis Preference than Crestar was entitled to have done by the corporation. And it involved no transfer of value to Hager personally since the value he acquired by then purchasing the note with his own funds had been reduced by the $40,000 paid out of corporate funds. Hager's use of the $40,000 in this way may have been unseemly personal conduct and even irregular as a matter of corporate governance, but having caused no injury to the corporate debtor nor personal gain to himself, could not give rise to liability for breach of any fiduciary duty owed to Preference.

The other unilateral misconduct charged by the Trustee to Hager—barring Roop from access to the business premises, conducting the liquidation sale, violating the escrow agreement—simply has no relevance (assuming it involved breach of any duty) to the $40,000 transaction.

## IV.

For the reasons given, we affirm the grant of summary judgment to the extent it includes an award of $75,444.32 representing the proceeds of the liquidation sale, reverse it to the extent it includes an award of $40,000 representing the sum used to pay down the Crestar note indebtedness, and remand the case to the district court with instructions to remand to the bankruptcy court for further proceedings consistent with this opinion.

*SO ORDERED.*