In re Nicky D. BIGGERS and Lora L. Biggers, Debtors.

Jeanne Burton Gregory, Trustee, Plaintiff,

v.

Community Credit Co., Defendant.

Bankruptcy No. 98–10714.
Adversary No. 99–0133A.

United States Bankruptcy Court, M.D. Tennessee.

June 22, 2000.

Gary R. Thompson, Gibson & Gregory, Nashville, TN, for plaintiff/trustee.

Michael I. Mossman, Nashville, TN, for defendant.

## MEMORANDUM

KEITH M. LUNDIN, Bankruptcy Judge.

The issue is whether Community Credit's perfection of a lien as part of the refinancing of a car loan within 90 days of bankruptcy created an avoidable preference under 11 U.S.C. § 547(b). Because the refinancing did not diminish the estate, the Trustee cannot avoid the lien. The following are findings of fact and conclusions of law. FED.R.BANKR.P. 7052

### FACTS

On July 12, 1997, the Debtors purchased a 1996 Dodge pickup truck from North Lake Auto Mall ("North Lake"). The retail installment contract was assigned to Cityside Financial Services of Wisconsin, Inc., d/b/a Cityside Indirect ("Cityside"). The amount financed was $20,154.10. The contract provided for monthly payments of $452.84 over five and one half years, for a total of $34,307.44.

On July 28, 1997, Cityside filed an Application for Certificate of Title and Registration with the Tennessee Department of Motor Vehicles ("TDMV"). On September 26, 1997, TDMV issued a certificate of title noting Cityside's lien on the truck.

On May 14, 1998, Cityside merged with Community Credit Company ("CCC"). CCC continued business at the same location as Cityside.

The Debtors refinanced the truck with CCC on September 14, 1998. The Debtors executed a new Note and Security Agreement to CCC. The amount financed was $21,235.32. The note provided for monthly payments of $499.63 over 5 years for total payments of $29,977.80. The Note and Security Agreement listed among the "itemization of amount financed" $18,-630.96, paid on Debtors' account. In addition to a lien on the pickup, CCC took a

lien on real property at Route 2, Bethpage, Tennessee.[1]

On September 30, 1998, CCC mailed to TDMV an Application for Noting of Lien on Certificate of Title. The Title Application was accompanied by a release of the Cityside lien, also dated September 30, 1998. Both were received by TDMV on October 2, 1998. On October 9, 1998, TDMV issued a new title that noted CCC as lienholder.

The Debtors filed Chapter 7 on November 12, 1998. The Chapter 7 Trustee filed this adversary to avoid CCC's lien on the pickup as a preferential transfer under 11 U.S.C. § 547(b). The parties filed cross motions for summary judgment.

## ARGUMENTS

The Trustee asserts that the September 1998 transaction was a new extension of credit that gave CCC a nonpurchase money security interest in the pickup on September 14, 1998. An application for title was not filed by CCC until October 2, 1998—18 days after the Debtors granted CCC the security interest. The Trustee submits that the perfection of the lien was a transfer to CCC on account of an antecedent debt, made while the debtors were insolvent, that enabled CCC to receive a greater percentage of its claim than if the transfer had not been made.

CCC contends that it is the successor to Cityside and enjoys continuous perfection of Cityside's lien. CCC asserts that a "renewal note does not discharge the original note unless all of the parties thereto agree that renewal is to have this effect." CCC submits that there was no period of "unperfection" during which a judgment creditor could have obtained a superior lien on the pickup. CCC cites Tennessee

---

1. In connection with the refinancing, CCC took for the first time a lien on real property of the Debtors. The Trustee has not challenged the transfer of that interest.

2. Tennessee Code Annotated § 47–9–303(2) states:

Code Annotated § 47–9–303(2)[2] for the proposition that its lien was continuously perfected during the preference period. Alternatively, CCC argues that its lien cannot be avoided because it was given in a contemporaneous exchange for value under 11 U.S.C. § 547(c)(1).

## DISCUSSION

Section 547(b) provides that a trustee may avoid a transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

    (A) on or within 90 days before the date of the filing of the petition;

    . . . .

(5) that enables such creditor to receive more than such creditor would receive if—

    (A) the case were a case under chapter 7 of this title

    (B) the transfer had not been made; and

    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). "All five elements are prerequisites to the finding of a voidable preference." *Ray v. Security Mutual Fin. Corp. (In re Arnett)*, 731 F.2d 358, 360 (6th Cir.1984).

■ CCC first challenges whether the refinancing transaction effected a transfer for preference purposes. CCC maintains that the only transfer between the Debtors and CCC/Cityside was the grant of the

---

If a security interest is originally perfected in any way permitted under this chapter and is subsequently perfected in some other way under this chapter, without an intermediate period when it was unperfected, the security interest shall be deemed to be perfected continuously for the purposes of this chapter.

security interest that accompanied the original lending in 1997.

There are reported decisions supporting CCC's position. For example, in *Wind Power Systems, Inc. v. Cannon Financial Group, Inc. (In re Wind Power Systems, Inc.)*, 841 F.2d 288 (9th Cir.1988), the Ninth Circuit concluded that an attachment lien levied during the preference period related back under California law to the date the creditor obtained a temporary protective order covering the same assets and thus the attachment lien was not an avoidable preference. In reaching this holding, the Ninth Circuit likened the attachment lien to the renewal of a lien or security interest explaining as follows:

> The renewal of a lien or security interest is not a new transfer within the meaning of section 547 if it merely continues an existing interest; it does not diminish the collection of assets to be distributed among the general creditors. *In re Cloyd*, 23 B.R. 51 (Bankr.E.D.Tenn. 1982). A "transfer" within the meaning of section 547 "occurs when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interests of the transferee." 11 U.S.C. § 547(e)(1)(B), (2)(B). An exchange that does not take value away from the debtor's estate cannot be a transfer within the reach of section 547. *Nicholson v. First Investment Co.*, 705 F.2d 410, 413 (11th Cir.1983).

841 F.2d at 292.

■ As discussed below, the Sixth Circuit has embraced the notion that a transfer which does not diminish the estate is not avoidable as a preference. However, the definition of transfer for preference purposes does not require valuation of the estate or a finding that the estate is diminished.

" 'Transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, ..." 11 U.S.C. § 101(54). "The definition of transfer is as broad as possible." S.Rep. No. 989, 95th Cong. 27 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.

The refinancing in 1998 contained several transfers to CCC for § 547(b) purposes. A new Note/Security Agreement was executed by the Debtors. The "date of loan" was September 14, 1998. The "amount paid on [Debtors'] account" was $18,630.96. The Security Agreement granted CCC a security interest in the Dodge truck and in "Other Property: RT 2 Bethpage, TN 37022." The original lien of Cityside was released by CCC. CCC applied for and TDMV issued a new title that noted CCC as first lienholder. The refinancing effected a "transfer of an interest of the debtors" to CCC at least when the Debtors granted a new security interest in the pickup and when CCC perfected a new lien.

■ These transfers were plainly "to or for the benefit of" CCC, made while the Debtors were insolvent and made within 90 days of the Chapter 7 filing.[3] While CCC's notation of its new lien was timely for perfection purposes under Tennessee law,[4] CCC's delay of 18 days to present TDVM with the application for title put CCC at risk of preference recovery. *See Fidelity Financial Services, Inc. v. Fink*, 522 U.S. 211, 118 S.Ct. 651, 139 L.Ed.2d 571 (1998) (state perfection law yields to federal preference law when the two are in conflict; the time period set forth in § 547(c)(3)(B) governs, no matter differing state law on the subject); *Ray v. Security Mutual Fin. Corp. (In re Arnett)*, 731 F.2d

3. Not contested.

4. Tenn.Code Ann. § 55–3–126(b)(2) (Michie 1998):

> The security interest is perfected as of the time of its creation if the delivery is completed within twenty (20) days thereafter. Otherwise, a security interest is perfected as of the date of delivery to the county clerk or the division of motor vehicles.

358, 363 (6th Cir.1984) (perfection of security interest in vehicle beyond 10 days after debt was created does not come within 11 U.S.C. § 547(c)(1)). Under § 547(e)(2)(A),[5] a transfer is "made" for preference purposes "at the time such transfer takes effect between the transferor and the transferee, if such transfer is perfected at, or within 10 days after, such time...." Because CCC's interest was not perfected within 10 days after the transfer, the transfer was deemed "made" pursuant to § 547(b)(2)(B) at the time the transfer was perfected, on October 2, 1998. As a result the Debtors transfer to CCC was on account of an antecedent debt.

■ The only remaining element of § 547(b) is whether the transfer enabled CCC to improve its position. Subsection (b)(5) of § 547 requires that the creditor receive a greater percentage recovery on its debt as a result of the transfer than it would receive had the transfer not been made and had the creditor received payment to the extent provided under Chapter 7. *Hager v. Gibson*, 109 F.3d 201, 210 (4th Cir.1997) (holding 11 U.S.C. § 547(b)(5) provides a safe harbor for creditors in receipt of prepetition transfers "who can establish that they received no more by the [transfer] than they would have received as claimants in a Chapter 7 liquidation"). This aspect of preference analysis is not new to the Bankruptcy Code. *See Waldschmidt v. Mid–State Homes, Inc. (In re Pitman)*, 843 F.2d 235, 241 (6th Cir.1988) (citing *Stewart v. Platt*, 101 U.S. (11 Otto) 731, 743, 25 L.Ed. 816 (1879)); *Nicholson v. First Inv. Co.*, 705 F.2d 410, 413 (11th Cir.1983) (Act case holding that "if the transfer did not dimin-

ish the bankrupt's estate, then there could be no preference").

Looking only at the "trees" and parsing each component of the refinancing, it is easy to conclude that the transfer allowed CCC to receive more than it would receive in a Chapter 7 case. CCC released the original (Cityside) lien on the pickup. CCC took a new note and received a new security interest. But for the new security interest, CCC would have been an unsecured creditor in a case under Chapter 7. Viewed in this narrow light, perfection of the new lien enabled CCC to realize a greater share of the estate.

However, in transactions that involve collateral substitution or renewal of a lien or security interest many courts have measured the transaction as a whole to determine whether the estate was diminished. In *Syzbist v. Crissman (In re Cosper)*, 106 B.R. 377 (Bankr.M.D.Pa.1989), the trustee sought to avoid a revived judgment lien as a preference. The original judgment did not create a lien because at the time the real property was held by the debtors as tenants by the entireties and could not be attached by the holder of a judgment against only one of the debtors. Subsequently, the property was deeded to one of the debtor's individually and the judgment creditor had the judgment revived. The court stated that "[a] transfer (e.g., renewal of judgment lien) which constitutes an existing interest or is a substitution for an interest already created does not create a preference if the renewal does not diminish the collection of assets or cause a diminution of the debtor's estate." *Id.* at 381 (citations omitted). The court reasoned that the original judgment, although it

---

**5.** For purposes of this section, a transfer is made—

(e)(2)(A) at the time such transfer takes effect between the transferor and the transferee, if such transfer is perfected at, or within 10 days after, such time, except as provided in subsection (c)(3)(B);

(B) at the time such transfer is perfected, if such transfer is perfected after such 10 days; or

(C) immediately before the date of the filing of the petition, if such transfer is not perfected at the later of—

(i) the commencement of the case; or

(ii) 10 days after such transfer takes effect between the transferor and the transferee.

11 U.S.C. § 547(e)(2).

could not attach to the property, did attach to the equitable and beneficial interests of the individual debtor. "[R]evival of the judgment ... automatically attached and its renewal continued the defendant's existing interest and did not diminish collection of assets nor diminish the possible distribution to creditors in this bankruptcy." *Id.*

Other courts have arrived at the same conclusion, sometimes by finding no transfer for preference purposes when there was no diminution of the estate. *Wind Power Sys., Inc. v. Cannon Fin. Group, Inc. (In re Wind Power Sys., Inc.)*, 841 F.2d 288, 291 (9th Cir.1988) (quoted above); *Lancaster v. First Nat'l Bank of Greeneville, Tenn. (In re Cloyd)*, 23 B.R. 51, 53–4 (Bankr.E.D.Tenn.1982) (The renewal of a lien or security interest is not a new transfer within the meaning of section 547 if it merely continues an existing interest; it does not diminish the collection of assets to be distributed among the general creditors.).

The Sixth Circuit has approved the logic of these decisions in the context of the contemporaneous exchange defense in § 547(c)(1).[6] In *Waldschmidt v. Mid-State Homes, Inc. (In re Pitman)*, 843 F.2d 235 (6th Cir.1988), the debtor executed a contract to buy real property, along with a promissory note and a mortgage, on July 12. On September 14, the seller accepted the contract in writing, but the seller waited until October 16 to record the deed to the debtor and the mortgage from the debtor. The debtor's bankruptcy was filed within 90 days and the trustee attacked the recording of the mortgage as a preference. The Sixth Circuit found that the mortgage transfer was a contemporaneous exchange for new value because the mortgage was exchanged for the transfer of the real property, a transaction without

preferential effect. The Sixth Circuit explained:

> The concept here is the same as the idea developed in old Supreme Court opinions under old bankruptcy acts—that a voidable preference must "impair," *Stewart v. Platt*, 101 U.S. (11 Otto) 731, 743, 25 L.Ed. 816 (1879), or "diminish," *Clark v. Iselin*, 88 U.S. (21 Wall) 360, 378, 22 L.Ed. 568 (1874), the estate. It is also the same as the idea developed in more recent circuit court opinions holding that payments made to a fully secured creditor were not voidable transfers because the payments reduced the amount of the debt with a corresponding increase in the value of the debtor's equity in the collateral. *See, e.g., Shaw v. Walter E. Heller & Co.*, 385 F.2d 353 (5th Cir.1967), *cert. denied*, 390 U.S. 1003, 88 S.Ct. 1248, 20 L.Ed.2d 104 (1968) .... In the instant case, the mortgage transfer which decreased the value of the estate could not have been made without the transfer of the warranty deed which correspondingly increased the value of the estate. So, the estate was "enriched as much as it was depleted," and the transfer had no preferential effect.

843 F.2d at 241–42.

As in *Pitman, Cosper, Wind Power* and *Cloyd*, it is outcome determinative here that the refinancing transaction as a whole did not deplete the estate. Whether CCC's refinancing lien is considered a continuation of the original (Cityside) lien, or whether the transaction is viewed as a substitution of collateral, the result is the same: At no time during the preference period could any creditor have prevailed over the interest held by CCC. The pickup was fully encumbered with no value available for the benefit of the estate. The

---

6.  11 U.S.C. § 547(c)(1) states:
    (c) The trustee may not avoid under this section a transfer—
    (1) to the extent that such transfer was—
    (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
    (B) in fact a substantially contemporaneous exchange.

refinancing lien lacked preferential effect for § 547 purposes.

Another way to describe this case is that CCC documented the refinancing of the debtor's pickup in a manner that created the technical elements of a preference, but without preferential effect. Taking a wholly new security interest and perfecting a new lien were transfers for § 547(b) purposes. Releasing the prior lien enables the trustee to win the greater percentage test argument. Perfecting the refinancing lien more than 10 days after the rest of the transaction defeats use of the contemporaneous exchange defense in § 547(c)(1). *Arnett,* 731 F.2d at 363; *Bavely v. Petrewsky (In re Petrewsky),* 147 B.R. 27 (Bankr. S.D.Ohio 1992); *Bank One, Dayton, N.A. v. Bavely (In re Phillips),* 103 B.R. 893, 895 (Bankr.S.D.Ohio 1989). But the trustee has no answer to CCC's argument that this "preference" did not diminish the expectations of other creditors under the Bankruptcy Code.

 This conclusion is consistent with the bankruptcy policies underlying the avoidance of preferences:

> The purpose of the preference [§ 547(b)] section is two-fold. First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all of his creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally.

H.R.REP. No. 595, 95th Cong., 177–78, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6138. "Congress identified the primary policy advanced by 11 U.S.C. § 547(b),

'[M]ost important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor.' The critical period in furthering this policy of equality of asset distribution occurs when an estate's funds are actually depleted." *Brown v. Shell Canada Ltd. (In re Tennessee Chem. Co.),* 112 F.3d 234, 238 (6th Cir.1997) (quoting H.R.REP. No. 595, at 177 (1977), U.S.Code Cong. & Admin.News 1977, p. 6138).

The refinancing of the Debtors' pickup did not effect an avoidable preference under § 547(b). An appropriate order will be entered.