**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

BRIAN BEVERATI; EMIL VAN AELST,
Plaintiffs-Appellants,

v.

SEWALL SMITH, Warden; MARYLAND
PENITENTIARY ADMINISTRATION;
WILLIAM FILBERT, Assistant Warden;

No. 96-7520

THEODORE PURNELL; JOHN
WOULDRIDGE, JR.; DONALD O.
JACKSON; DONNELL SESSIONS,
Correctional Officer II; PATRICK
FORD; RICHARD A. LANHAM, SR.,
Defendants-Appellees.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.
(CA-94-976-CCB, CA-94-978-CCB)

Argued: May 5, 1997

Decided: August 11, 1997

Before WILKINS, Circuit Judge, Joseph F. ANDERSON, Jr.,
United States District Judge for the
District of South Carolina, sitting by designation,
and TRAXLER, United States District Judge for the
District of South Carolina, sitting by designation.

_____

Affirmed by published opinion. Judge Wilkins wrote the opinion, in
which Judge Anderson and Judge Traxler joined.

_____

**COUNSEL**

**ARGUED:** Joseph Bernard Tetrault, PRISONER RIGHTS INFOR-MATION SYSTEM OF MARYLAND, INC., Chestertown, Maryland, for Appellants. David Phelps Kennedy, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARY-LAND, Baltimore, Maryland, for Appellees. **ON BRIEF:** W. Michel Pierson, PIERSON, PIERSON & NOLAN, Baltimore, Maryland, for Appellants. J. Joseph Curran, Jr., Attorney General of Maryland, Toni-Jean Lisa, Assistant Attorney General, Baltimore, Maryland, for Appellees.

_____

**OPINION**

WILKINS, Circuit Judge:

State prisoners Brian Beverati and Emil Van Aelst (collectively, "Inmates") appeal a decision of the district court granting summary judgment in favor of the defendant prison officials **1** in this action brought pursuant to 42 U.S.C.A. § 1983 (West 1994). The district court rejected Inmates' claims that the prison officials violated their rights under the Fourteenth and Eighth Amendments by confining them to administrative segregation for a period of six months following the confiscation of materials considered by the prison officials to be escape paraphernalia from the cell Inmates shared. For the reasons set forth below, we affirm.

I.

During the spring of 1993, the Maryland Penitentiary, a maximum security facility housing state prisoners serving lengthy sentences,

_____

**1** Inmates named as defendants Sewall Smith, then Warden of the facility; Richard A. Lanham, Sr., Commissioner of the Division of Corrections; William Filbert, Assistant Warden; Theodore Purnell, then Chief of Security; and Correctional Officers John Wouldridge, Jr., Donald O. Jackson, Donnell Sessions, and Patrick Ford. For ease of reference, we refer to the defendants collectively as "the prison officials."

2

was undergoing major reconstruction that involved the removal of an entire section of the building and its accompanying exterior security perimeter. The security concerns incident to the removal of a portion of the outside perimeter were compounded by the numerous comings and goings necessitated by the construction activities and by the receipt of anonymous information concerning a plan for a mass escape.

Beverati and Van Aelst are prisoners committed to the Maryland Penitentiary. Beverati is serving a life sentence with the possibility of parole, and Van Aelst is serving a sentence of 30 years without parole. In March 1993, Beverati and Van Aelst were cellmates in the general prison population. On March 27, prison officials searched their cell and discovered a large quantity of denim fabric--some of which had been fashioned into vests and modified jeans--thread, blankets, two packages of inmate movement passes, and other unauthorized items. This was the second occasion within a two-month period that such materials, considered by the prison officials to be escape paraphernalia, had been found in Inmates' cell.

As a result of this discovery, Inmates were placed in administrative segregation and were charged with violations of several institutional rules, including regulations prohibiting possession of implements that reasonably could be used to escape and possession of contraband. On March 30, a hearing on these charges was conducted before a hearing officer. Van Aelst took "full responsibility" for possession of the materials, pled guilty to possession of contraband, and was sentenced to 30 days of restriction. In light of Van Aelst's confession, the hearing officer found Beverati not guilty.

Nevertheless, Inmates were retained in administrative segregation after disposition of the disciplinary charges based on the prison officials' belief that Inmates constituted an escape risk and a danger to the security of the institution, staff, and other inmates. During the period in which Inmates were confined to administrative segregation, classification reviews were conducted approximately every 30 days. On each occasion, the reviewing prison officials determined that Inmates should remain in segregation, citing these same concerns and an ongoing investigation into the escape attempt. Beverati and Van

Aelst were not released from administrative segregation until October 26 and September 26, 1993 respectively.[2]

Inmates subsequently filed separate complaints in the district court, alleging that their constitutional rights had been violated by, inter alia, the continuation of their confinement in administrative segregation. The prison officials moved to dismiss or alternatively for summary judgment, and Inmates submitted affidavits in opposition. Treating the motion as one for summary judgment, the district court ruled in favor of the prison officials. Inmates appeal from that decision, raising a procedural due process claim, a substantive due process claim, and an Eighth Amendment claim relating to the continuation of their confinement in administrative segregation. We address these arguments in turn.

II.

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Inmates maintain that their rights under this provision were violated in two respects by the continuation of their confinement in administrative segregation. First, they contend that the confinement deprived them of a liberty interest in remaining in the general prison population and that the process that they were afforded in connection with the deprivation of that interest was inadequate. Second, they assert that the decision by the prison officials to continue their confinement in administrative segregation was so arbitrary that it resulted in a denial of substantive due process.

In order to prevail on either a procedural or substantive due process claim, Inmates must first demonstrate that they were deprived of "life, liberty, or property" by governmental action. See Plyler v. Moore, 100 F.3d 365, 374 (4th Cir. 1996), cert. denied, 117 S. Ct. 2460 (1997); Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 826-27 (4th

_____

[2] Beverati was approved for release in September 1993 as well, but chose to remain in administrative segregation because he found the housing assignment available to him in the general prison population to be unacceptable.

4

Cir. 1995); Love v. Pepersack, 47 F.3d 120, 122 (4th Cir. 1995). It is undisputed that Inmates were not deprived of life or property by governmental action; they claim only that the prison officials' decision deprived them of a liberty interest in avoiding administrative segregation.

> States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

Sandin v. Conner, 115 S. Ct. 2293, 2300 (1995) (emphasis added) (citations omitted). Since there is no contention here, nor logically could there be, that the confinement to administrative segregation exceeds the sentence imposed in such an extreme way as to give rise to the protection of the Due Process Clause by its own force, the question before us is whether Inmates' confinement in administrative segregation imposed such an atypical hardship on them vis a vis ordinary prison life that they possessed a liberty interest in avoiding it.**3**

_____

**3** Prior to the decision of the Supreme Court in Sandin, the analysis of whether a prisoner was deprived of a liberty interest focused not on the nature of the deprivation experienced by the prisoner, but on the language of the applicable prison regulations and whether such language was "mandatory." Sandin, 115 S. Ct. at 2298-99. In Sandin, Chief Justice Rehnquist explained that "[b]y shifting the focus of the liberty interest inquiry to one based on the language of a particular regulation, and not the nature of the deprivation, the Court [had] encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges." Id. at 2299. This encouragement had given rise to at least two serious and detrimental consequences: (1) states were provided a disincentive to adopt written direction to guide the discretion of prison officials; and (2) federal courts were overly involved in the day-to-day management of prisons. See id. These concerns led the Sandin Court to retreat from the mandatory language approach of Hewitt v. Helms, 459 U.S. 460 (1983). See id. at 2300.

5

In order to determine whether the inmates possessed a liberty interest, we must compare the conditions to which they were exposed in administrative segregation with those they could expect to experience as an ordinary incident of prison life. See id. at 2301. This analysis necessarily is fact specific in that it requires a determination of the conditions the prisoner maintains give rise to a liberty interest and those incident to normal prison life. See, e.g. , Driscoll v. Youngman, 105 F.3d 393, 394 (8th Cir. 1997) (per curiam); Samuels v. Mockry, 77 F.3d 34, 38 (2d Cir. 1996) (per curiam); Whitford v. Boglino, 63 F.3d 527, 533 (7th Cir. 1995) (per curiam). But, the ultimate determination of whether the conditions impose such an atypical and significant hardship that a liberty interest exists is a legal determination, subject to de novo review. See Sandin, 115 S. Ct. at 2301-02.

Because this appeal is before us on review from the grant of summary judgment, we must view the evidence presented in the light most favorable to Inmates and review de novo the appropriateness of the grant of summary judgment, applying the same standard as the district court. See Sylvia Dev. Corp., 48 F.3d at 817. The factual nature of the analysis required by Sandin has led some courts of appeals to remand to permit the district court to conduct an initial examination of the factual record. See Driscoll , 105 F.3d at 394; Samuels, 77 F.3d at 38. We agree that it is inappropriate for this court to render a finding of fact on a disputed issue in the first instance, see Yancey v. Varner (In re Pucci Shoes, Inc.), No. 96-2276, 1997 WL 409176 (4th Cir. July 23, 1997), and that a remand to the district court for consideration of an issue in the first instance is sometimes appropriate, see Campbell v. Hewitt, Coleman & Assocs., 21 F.2d 52, 55-56 (4th Cir. 1994). In general, though, when this court reviews the grant of summary judgment, it considers the record before the district court de novo and addresses the properly preserved arguments raised by the appellant and, if necessary, all properly preserved alternative bases for affirmance advanced by the appellee. See Hager v. Gibson, 109 F.3d 201, 208 (4th Cir. 1997). In doing so, our function is to determine whether the evidence presents a genuine issue of material fact requiring a trial. See Sylvia Dev. Corp. , 48 F.3d at 817-18. Here, we determine that a remand to permit the district court to conduct a comparison of the conditions in administrative segregation to those incident to normal prison life is unnecessary because taking the evi-

dence in the light most favorable to Inmates, the prison officials are entitled to judgment as a matter of law.

Inmates complain of a six-month administrative confinement, claiming that the length of the confinement and the conditions to which they were exposed made the assignment an atypical and significant hardship. The applicable prison regulations indicate that the conditions in administrative segregation are similar in most respects to those experienced by inmates in the general population and that even those conditions that are more restrictive are not particularly onerous. Indeed, the differences in conditions specified in the prison regulations appear to be fairly common ones, leading the other courts of appeals to conclude that confinement to administrative segregation does not implicate a liberty interest. See Talley v. Hesse, 91 F.3d 1411, 1413 (10th Cir. 1996); Crowder v. True, 74 F.3d 812, 814-15 (7th Cir. 1996) (per curiam); Luken v. Scott, 71 F.3d 192, 193 (5th Cir. 1995) (per curiam), cert. denied, 116 S. Ct. 1690 (1996); Rimmer-Bey v. Brown, 62 F.3d 789, 790-91 (6th Cir. 1995).

Inmates, however, have submitted affidavits attesting that the actual conditions in administrative segregation are more onerous than those specified in the prison regulations. They claim that when they were initially placed in segregation, their cells were infested with vermin; were smeared with human feces and urine; and were flooded with water from a leak in the toilet on the floor above. And, they assert, they were forced to use their clothing and shampoo to clean the cells. In addition, Inmates maintain that their cells were unbearably hot and that the food they received was cold. Furthermore, Van Aelst submitted an affidavit indicating that those assigned to administrative segregation did not receive clean clothing, linen, or bedding as often as required by the regulations governing administrative segregation; that they were permitted to leave their cells three to four times per week, rather than seven, and that no outside recreation was permitted; that there were no educational or religious services available; and that food was served in considerably smaller portions. Accepting Inmates' version of the conditions in administrative segregation, as we must for purposes of review of the grant of summary judgment, we conclude that although the conditions were more burdensome than those imposed on the general prison population, they were not so atypical

7

that exposure to them for six months imposed a significant hardship in relation to the ordinary incidents of prison life.

In sum, we conclude that viewing the conditions of confinement in administrative segregation that are alleged by Inmates in the light most favorable to them, the conditions do not implicate a liberty interest. And, because they possessed no liberty interest in avoiding confinement in administrative segregation, the district court properly granted summary judgment in favor of prison officials on Inmates' procedural and substantive due process claims.

III.

Inmates next contend that their confinement in administrative segregation violated the Eighth Amendment prohibition against the infliction of cruel and unusual punishment. See U.S. Const. amend. VIII.[4] Interestingly, they do not argue that the conditions to which they were exposed during their confinement to administrative segregation were violative of the Eighth Amendment.[5] Rather, they maintain that their six-month confinement in administrative segregation was a grossly excessive punishment. See Solem v. Helm, 463 U.S. 277, 288 (1983) (holding that the Eighth Amendment prohibits sentences that are "grossly disproportionate and excessive punishment" in relation to the offense). Although we question the propriety of doing so, we assume for purposes of discussion that such an argument might be cognizable in the context of administrative punishment for a violation of a prison regulation. See Adams v. Carlson, 488 F.2d 619, 635-36 (7th Cir. 1973); cf. Rhodes v. Chapman, 452 U.S. 337, 347 (1981) (noting that prison conditions may not be"grossly disproportionate to the severity of the crime warranting imprisonment"). Nevertheless, we conclude that Inmates' argument must fail on the

_____

[4] The Eighth Amendment applies to the States through the Fourteenth Amendment. Wilson v. Seiter, 501 U.S. 294, 296-97 (1991).
[5] Inmates' failure to press an Eighth Amendment claim predicated on the conditions of their confinement in administrative segregation no doubt stems from their recognition that such a claim must fail, if for no other reason than that they made no showing that the conditions resulted in serious physical or emotional injuries or the grave risk of such harm. See Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995).

8

basis of our repeated holdings that outside the context of a capital sentence a proportionality review is necessary only with respect to sentences of life imprisonment without the possibility of parole. <u>See, e.g.,</u> <u>United States v. Kratsas</u>, 45 F.3d 63, 67 (4th Cir. 1995).

IV.

For the foregoing reasons, we conclude that Beverati and Van Aelst's claims that they were denied procedural and substantive due process and were subjected to cruel and unusual punishment in their assignment to administrative segregation are without merit. Consequently, we affirm the decision of the district court granting judgment in favor of the prison officials.

<u>AFFIRMED</u>

9