**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JOHN E. WALSH,
Petitioner-Appellant,

v.

THOMAS R. CORCORAN, Warden; J.
JOSEPH CURRAN, JR.,
Respondents-Appellees,

and
                                                                    No. 98-7853

PARRIS N. GLENDENING, Governor;
RICHARD A. LANHAM, SR.,
Commissioner; NORMA GLUCKSTERN,
Previous Director, Patuxent
Institution; PATUXENT BOARD OF
REVIEW, John/Jane Doe defendants,
Respondents.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Marvin J. Garbis, District Judge.
(CA-98-941-MJG)

Argued: January 24, 2000

Decided: March 29, 2000

Before WIDENER, WILLIAMS, and KING, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Paul Victor Jorgenson, Middletown, Maryland, for Appellant. David Phelps Kennedy, Assistant Attorney General, Baltimore, Maryland, for Appellees. **ON BRIEF:** J. Joseph Curran, Jr., Attorney General of Maryland, Baltimore, Maryland, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

John Walsh, an inmate currently in the custody of Maryland's Division of Correction (DOC), appeals the order of the district court denying his petition for writ of habeas corpus. He claims that the 1977 revisions to Maryland's Patuxent statute violated the Ex Post Facto Clause in two ways. First, he contends that the revisions increased the measure of punishment for his crimes by transforming his civil commitment at Maryland's Patuxent Institution (Patuxent), a psychiatric treatment facility for Maryland inmates, into a punitive incarceration. Second, he claims that the revisions violated the Ex Post Facto Clause by eliminating his opportunity to gain early, unconditional release from state custody once he had recovered sufficiently from his status as a "defective delinquent" for the staff at Patuxent to recommend that he be discharged. Finally, he asserts that his transfer from Patuxent to the general prison population in the DOC deprived him of a state-created liberty interest in remaining at Patuxent and receiving its treatment programs that is protected by the Due Process Clause. Because we find that the revisions actually decreased the potential length of his confinement, and that the revisions did not eliminate his opportunity to gain early release from state custody during his years in confinement at Patuxent, we agree with the district court that the 1977 revisions do not run afoul of the Ex Post Facto Clause. Furthermore, because we find that Walsh's

2

removal from Patuxent did not result in Walsh's experiencing a significant and atypical hardship in relation to the ordinary incidents of prison life, we agree with the district court that Walsh was not deprived of a state-created liberty interest. Accordingly, we affirm the district court's denial of Walsh's petition for a writ of habeas corpus.

I.

In 1970, John Walsh was convicted, upon entering a guilty plea, of rape and kidnapping in Maryland state court and sentenced to a seventy-two-year term of imprisonment. In 1971, he was committed to Patuxent. Under Maryland law in effect before 1977, a prosecutor, the DOC, or a previously sentenced defendant could file a request with the sentencing court asking that the defendant be examined at Patuxent, a mental institution, to determine whether he qualified for admission to Patuxent as a "defective delinquent." See Md. Ann. Code art. 31B § 6(b) (1971). Upon such a request, or upon its own initiative, the sentencing court could order that a defendant be evaluated by the Patuxent staff. See id.[1] Under the former Patuxent statute,[2] a "defective delinquent" was defined as:

> an individual who, by the demonstration of persistent aggravated antisocial or criminal behavior, evidences a propensity toward criminal activity, and who is found to have either such intellectual deficiency or emotional unbalance, or both, as to clearly demonstrate an actual danger to society so as to require such confinement and treatment, when appropriate, as may make it reasonably safe for society to terminate the confinement and treatment.

_____

[1] Appellees do not dispute Walsh's assertion that his sentencing court recommended, as part of a plea agreement, that he be evaluated by the Patuxent staff. In any event, the question of who recommended that Walsh be evaluated is irrelevant to the issues presented by this appeal.
[2] This opinion refers to those provisions of Maryland law governing the administration of Patuxent as the Patuxent statute. These provisions, which have obviously changed in content over the years, were formerly codified at Article 31B of the Annotated Code of Maryland (1957), but are now located in the Correctional Services Article of the Annotated Code of Maryland.

3

Md. Ann. Code art. 31B § 5 (1971). If the staff concluded that the defendant was a "defective delinquent," the sentencing court conducted a trial on the issue of whether the defendant was a "defective delinquent." If the court found that the defendant was a "defective delinquent,"**3** the defendant was committed to Patuxent "for an indeterminate period without either maximum or minimum limits" and his original sentence was suspended. Md. Ann. Code art. 31B § 9(b) (1971).

While at Patuxent, inmates received psychiatric treatment for the mental affliction that made them "defective delinquents." Patuxent's Institutional Board of Review (IBR)**4** then reviewed the status of the "delinquent" at least once every calendar year. See Md. Ann. Code art. 31B § 13(b) (1971). Under the statute, the IBR could grant a leave of absence or parole, if it found that parole was for the inmate's benefit and the benefit of society, or recommend the inmate's unconditional release from custody as a "defective delinquent." See Md. Ann. Code art. 31B §§ 13(d) and (f) (1971). Upon the IBR's recommendation that an inmate be unconditionally released from custody as a "defective delinquent," the sentencing court not only possessed the authority to order an unconditional release, but it could also order that the inmate be paroled, granted a leave of absence, returned to Patuxent, or transferred to the DOC to serve out his original sentence. See Md. Ann. Code art. 31B § 13(f) (1971). When the sentencing court chose to reimpose the original sentence and transfer a defendant to the

_____

**3** A defendant could request a jury trial on the issue of whether he was a "defective delinquent." See Md. Ann. Code art. 31B § 8(c) (1971). In that case, the jury, not the court, would decide the issue. See Md. Ann. Code art. 31B, § 9(a) (1971).

**4** The IBR's members included the director of Patuxent, the three associate directors, a professor from the University of Maryland School of Law who was a member of the advisory board of Patuxent, either of the members of the Maryland bar who were members of Patuxent's advisory board, and a sociologist. See Md. Ann. Code art. 31B § 12 (1971). Although the positions from which the IBR draws its membership have changed over the years -- for example, the IBR now includes the warden of Patuxent and members of the public, but does not include a law professor or a sociologist, see Md. Code Ann., Correctional Services § 4-205 (1999) -- Walsh does not allege that this change in composition resulted in any constitutional violation.

4

DOC, the defendant was entitled to credit against that sentence for time spent at Patuxent. See id.

Patuxent inmates were also allowed to petition a state court for review of their status, beginning two years after their initial confinement to the Institution but not before two-thirds of their sentence had expired. See Md. Ann. Code art. 31B, § 10(a) (1971). The inmate was brought before a court and permitted to request a jury, which would determine whether he was still a "defective delinquent." See id. If found to be a "defective delinquent," he was returned to Patuxent; however, if the jury found that he was no longer a"defective delinquent," the court could release him unconditionally or commit him to the DOC under his original sentence, with credit for time served at Patuxent. See id.

In 1977, the Patuxent statute underwent major revisions in the wake of criticism that inmates at Patuxent, who served indeterminate sentences and were released only after they were no longer "defective delinquents," often remained in confinement at Patuxent long after their original sentences had expired. See Gluckstern v. Sutton, 574 A.2d 898, 901 (Md. 1990). In re-writing the statute, the state legislature provided that a Patuxent inmate's original sentence was no longer suspended when he entered Patuxent; thus, when he served the length of his original sentence, he was entitled to be released. See Md. Code Ann., Correctional Services § 4-304(a) (1999). [5] Indeterminate sentences for inmates at Patuxent were eliminated.

The legislature made other changes to the statute. Under the re-written provisions, a person committed to Patuxent was not committed as a "defective delinquent," but as an"eligible person." An "eligible person" is defined as

> an individual who, (i) has been convicted of a crime and is
> serving a sentence of imprisonment with at least 3 years

_____

[5] All citations to the post-1977 Patuxent statute are to the current (1999) Annotated Code of Maryland. Although they have been recently transplanted from former Article 31B to the Correctional Services Article, the contents of the relevant sections have remained substantively unchanged since 1977.

5

remaining on the sentence; (ii) has an intellectual impairment or emotional imbalance; (iii) is likely to respond favorably to the programs and services that the Institution provides; (iv) can better respond to remediation through those programs and services than by other incarceration; and (v) meets the eligibility criteria that the Secretary establishes under § 4-208 of this title.

Md. Code Ann., Correctional Services § 4-101(e) (1999).[6] No longer did sentencing courts determine whether a defendant was a "defective delinquent" upon receiving a recommendation from the staff of Patuxent. Instead, the Patuxent staff itself assumed complete control over whom to admit as an "eligible person." See Md. Code Ann., Correctional Services §§ 4-301, 302(b) (1999). The IBR continued to conduct annual reviews of the inmates, see Md. Code Ann., Correctional Services § 4-302(d), and it retained the discretion to grant parole when parole would not impose an unreasonable risk to society and would aid in the remediation of an "eligible person." See Md. Code Ann., Correctional Services § 4-305 (1999). As noted above, under the old statute, Maryland courts could choose to release a Patuxent inmate unconditionally upon the IBR's recommendation following its annual review of the inmate. Under the revised statute, Maryland courts retained their discretion to order an unconditional release upon receiving a recommendation from the IBR. The IBR, however, could not make a recommendation for unconditional release until after the inmate had successfully served three years on parole without a violation. See Md. Code Ann., Correctional Services § 4-305(f). The revisions also eliminated the ability of a prisoner at Patuxent to petition a court to review his status following the expiration of two-thirds of his original sentence. Finally, under the revised statute, the IBR could determine that an inmate was no longer an "eligible person" and then

_____

[6] The 1977 revisions did not include part (v) of the definition. Part (v) refers to Md. Code Ann., Correctional Services § 4-208 (1999), which allows the Secretary of Public Safety and Correctional Services to adopt regulations to carry out the provisions of Title 4 of the Correctional Services Article. Since 1977, there have also been some minor, non-substantive, changes to the wording of the definition. Walsh does not argue that these subsequent changes somehow enhanced the alleged constitutional violations caused by the 1977 revisions.

transfer a prisoner to the DOC without first petitioning the inmate's sentencing court. See Md. Code Ann., Correctional Services §§ 4-306(b)(2) and (b)(3) (1999).

The revised statute also included a transitional provision to reimpose the original sentences of inmates committed before July 1977. Under the revised statute, Walsh's seventy-two-year sentence was "reimposed as of the time it was originally entered, with credit for time spent at the Institution." Md. Ann. Code of 1957, art. 31B § 16(b)(1) (1983). After reimposition of his sentence in 1977, Walsh remained at Patuxent until September 28, 1990, when the IBR determined that he was no longer an "eligible person." Walsh was then transferred to the DOC to serve out the remainder of his seventy-two-year sentence.

In 1998, Walsh filed a petition for a writ of habeas corpus in the United States District Court for the District of Maryland. Among other grounds for relief not pertinent here, Walsh asserted that the 1977 legislative changes to the Patuxent statute violated the Ex Post Facto Clause and denied him due process by depriving him of an alleged liberty interest in remaining at Patuxent and receiving its treatment programs.[7] After the district court denied the petition and denied Walsh's request for a certificate of appealability, we granted a certificate of appealability on his ex post facto and due process claims.

_____

[7] In 1995, Walsh filed a habeas petition in which he raised the same arguments contained in his 1998 petition. The district court dismissed the petition without prejudice because Walsh had not raised a challenge to the 1977 revisions in state post-conviction proceedings. When Walsh refiled his petition in 1998, the state conceded that Walsh had exhausted his available state remedies in state post-conviction proceedings, and the district court proceeded to the merits of his claims.

In 1998, Walsh supplemented his petition with a claim against several state officials, including the governor, for monetary damages under 42 U.S.C.A. § 1983 (West Supp. 1999) for wrongful imprisonment. Walsh does not challenge the district court's dismissal of this claim.

II.

Walsh argues that the 1977 revisions harmed him for purposes of the Ex Post Facto Clause in two ways. **8** First, he claims that the revisions increased the measure of punishment for his crimes by transforming his civil commitment at Patuxent**9** into a punitive incarceration. Second, he argues that the revisions cost him his opportunity, provided by the pre-1977 statute, for an unconditional release from state custody once he had recovered sufficiently from his status as a "defective delinquent" for the IBR to recommend his discharge.

The Ex Post Facto Clause is violated when a statute punishes an act that was previously non-criminal, makes the punishment for a crime more severe than when the crime was committed, or deprives a person charged with a crime of a defense that was previously available. See Collins v. Youngblood, 497 U.S. 37, 42 (1990). In other words, "[t]o fall within the ex post facto prohibition, a law must be retrospective . . . and it must disadvantage the offender affected by it by altering the definition of criminal conduct or increasing the punishment for the crime." Lynce v. Mathis, 117 S. Ct. 891, 896 (1997) (internal citations and quotation marks omitted); accord United States v. Lominac, 144 F.3d 308, 311 (4th Cir. 1998). In looking at a change to a statute to see if it violates the Ex Post Facto Clause, "we must determine whether it produces a sufficient risk of increasing the measure of punishment attached to the covered crimes." California Dep't of Corrections v. Morales, 514 U.S. 499, 509 (1995). As the Supreme Court noted in Morales,

> the focus of the ex post facto inquiry is not on whether a legislative change produces some ambiguous sort of "disadvantage," nor . . . on whether an amendment affects a prisoner's "opportunity to take advantage of early release," but on whether any such change alters the definition of criminal

_____

**8** Article I, § 10, of the United States Constitution prohibits the states from passing any "ex post facto Law."

**9** As Walsh correctly notes, this Court determined, during the first year of his commitment to Patuxent, that the Patuxent statute is civil, rather than criminal, in nature. See Tippett v. Maryland, 436 F.2d 1153, 1156-57 (4th Cir. 1971).

8

conduct or increases the penalty by which a crime is punishable.

Id. at 506 n.3 (internal citation omitted). It is clear that a change to a statute that "creates only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes" will fall short of violating the Ex Post Facto Clause. Id. at 509. We review whether a change in law constitutes a violation of the Ex Post Facto Clause under a de novo standard. See Plyler v. Moore, 129 F.3d 728, 734 (4th Cir. 1997).

Walsh's first assertion, that the 1977 revisions increased his punishment by transforming his civil commitment at Patuxent into a punitive incarceration, is without merit. According to Walsh, the revisions harmed him by "transform[ing] Walsh's civil confinement for the purposes of rehabilitation and treatment into an immediate, mandatory, criminal punishment of 72 years duration." (Appellant's Br. at 19.) In enacting the revisions, the Maryland legislature reimposed his original sentence, "subject[ing] Walsh to thirteen years of criminal imprisonment at Patuxent (1977-1990) [and][ten] more years of incarceration at DOC prisons (1990-[2000])." (Appellant's Br. at 19.) As Appellees concede, it is clear that the 1977 changes operated retrospectively. The key inquiry, then, is whether the legislature increased Walsh's punishment simply by reimposing his criminal sentence. The short answer is no. Before 1977, commitment to Patuxent was indeterminate, and it was certainly feasible for a defendant to serve a longer term of confinement there than if he served out his sentence in the DOC. See Gluckstern v. Sutton, 574 A.2d 898, 901 (Md. 1990). The 1977 revisions ensured that no inmate, including Walsh, would serve an indeterminate, life-long sentence at Patuxent. It is important to reiterate that, before the 1977 revisions reimposed his suspended sentence, Walsh faced the prospect of remaining an inmate in Patuxent for the rest of his life.[10] After the revisions reimposed his suspended

_____

[10] We note that, under the pre-1977 statute, a Patuxent inmate's original sentence was merely suspended, not erased, and it could be reimposed under several sets of circumstances. For example, an inmate would be returned to the DOC if the IBR petitioned the inmate's sentencing court for a return to the DOC after the inmate had been paroled from Patuxent

9

sentence, he no longer faced this prospect. Walsh concedes, as he must, that the time he spent in Patuxent has been credited against his original seventy-two-year sentence. Once he finishes serving that sentence, he must be released. We agree with the district court that the legislature's reimposition of the suspended sentence was therefore an ameliorative change that, if anything, actually decreased the amount of time that Walsh will be confined. See Dobbert v. Florida, 432 U.S. 282, 294 (1977) ("It is axiomatic that for a law to be ex post facto it must be more onerous than the prior law.").**11** Not even wildly imagi-

_____

and the sentencing court granted the petition, see Md. Ann. Code art. 31B § 13(d) (1971); if the IBR recommended his release and the sentencing court disagreed with that recommendation, see Md. Ann. Code art. 31B § 13(f) (1971); or if the inmate filed a petition for unconditional release after serving the equivalent of two-thirds of his original sentence and the sentencing court found that he was no longer a "defective delinquent" but that he needed to serve out his original sentence in the DOC, see Md. Ann. Code art. 31B § 10(a) (1971).

**11** Walsh cites a number of cases in which state and federal courts stated, either before or during his initial years at Patuxent, that a prisoner's detention at Patuxent is civil in nature and not a form of punishment, but of prevention, treatment, and therapy. See , e.g. Tippett v. Maryland, 436 F.2d 1153, 1156-57 (4th Cir. 1971) (noting that considerations of punishment do not dictate an inmate's admittance to Patuxent); Director of Patuxent Inst. v. Daniels, 221 A.2d 397, 411 (Md. 1966) ("The law on its face clearly shows that it was not enacted to promote the aims of punishment, retribution and deterrence, but its only purpose is for the protection of society, and the treatment of the individual to effectuate a cure if at all possible."). Therefore, he argues, he went from having no punishment (serving an indeterminate sentence at Patuxent that was not imposed for punitive purposes instead of his original 72-year sentence) to having a 72-year sentence. This argument ignores that his original sentence was never revoked and, as noted in footnote 10, could have been reimposed even under the 1977 statute.

Walsh relies primarily upon Kansas v. Hendricks , 117 S. Ct. 2072 (1997), for the proposition that his civil commitment to Patuxent was not a form of punishment; therefore, he argues, the reimposition of his criminal sentence necessarily increased his punishment. His reliance upon Hendricks is misplaced because, in that case, the Supreme Court held that the civil commitment proceedings at issue, which followed the end

10

native speculation of the sort rejected by Morales could posit that the replacement of a prisoner's indeterminate, indefinite sentence at Patuxent with a determinate sentence somehow increases his punishment.**12**

_____

of a defendant's criminal sentence, did not violate the Ex Post Facto Clause because the proceedings were not punitive in nature. See id. at 2085. The Court was not addressing the situation in which a criminal sentence was suspended in favor of an indeterminate civil commitment and then reimposed. Indeed, because Walsh's criminal sentence was never erased by his commitment to Patuxent, restoring it and giving Walsh credit against it for time served at Patuxent was not an increase in punishment irrespective of the nature of Walsh's confinement at Patuxent.

**12** As part of his first argument regarding his ex post facto claim, Walsh contends that the reimposition of his sentence immediately following the 1977 revisions robbed him of his chance to avoid reimposition of that sentence and a subsequent transfer to the DOC by having a sentencing court consider the possibility of unconditional release before reimposing his sentence. To be sure, as Walsh notes, the reimposition of his original sentence in July of 1977 did not, as it would have under § 13(f) of the pre-1977 statute, follow a determination by both the IBR and Walsh's sentencing court that he should have gained "unconditional release from custody as a defective delinquent." Md. Ann. Code art. 31B § 13(f) (1971). However, the 1977 reimposition was still ameliorative because it guaranteed that Walsh would only serve his original 72-year sentence, against which his previous years at Patuxent were credited, instead of potentially remaining in Patuxent for the rest of his life. If the old regime had stayed in place and Walsh had never left Patuxent, the only way that Walsh, from 1977 until the present, could have had his sentencing court consider the possibility of unconditional release before reimposing his sentence was if the IBR recommended that he be granted unconditional release. No provision of the old statute required that the IBR ever make that recommendation. Thus, instead of robbing Walsh of a chance for his sentencing court to consider a recommendation that never had to be made under the old regime, the 1977 revisions ensured that Walsh would see an end to his period of confinement in state custody even if such a recommendation was never made. Moreover, as discussed below, even after the reimposition of his sentence following the 1977 revisions, Walsh was still afforded the opportunity to gain early, unconditional release from that sentence during his time at Patuxent. Unlike the pre-

11

Walsh's next argument is that, by reimposing his original sentence, the revisions cost him his opportunity, provided by the pre-1977 statute, for a sentencing court to consider the option of unconditionally releasing him from state custody once he had recovered sufficiently from his status as a "defective delinquent." This assertion is without merit, as the post-1977 statute did provide Walsh and other inmates with the opportunity to have their sentences vacated and to gain unconditional release from Patuxent once the IBR and the inmate's sentencing court agreed that it was safe to release the inmate. As noted above, the IBR made an annual review of every inmate at Patuxent under the pre-1977 statute. It then could decide that an inmate should remain classified as a "defective delinquent" and remain at Patuxent; that the inmate be granted parole or a leave of absence; or that the inmate should be granted his unconditional release from custody as a "defective delinquent." <u>See</u> Md. Ann. Code art. 31B § 13 (1971). If the IBR chose the last option, it was to inform the inmate's sentencing court of its recommendation. Md. Ann. Code art. 31B § 13(f). The sentencing court, however, was not bound by this recommendation. On its own, it was to determine

> whether the [inmate] shall be released unconditionally from custody as a defective delinquent, released conditionally on a leave of absence or parole, returned to the custody of the Institution as a defective delinquent, or returned to the Department of Correction, to serve the original sentence upon which he was committed prior to being classified as a defective delinquent.

<u>Id.</u>

It is important to note that, after the 1977 revisions, the IBR contin-

_____

1977 statute, in which transfer to the DOC was an automatic consequence of the reimposition of the original sentence, <u>see</u> Md. Ann. Code art. 31B § 13(f), the post-1977 statute allows Patuxent inmates to remain in Patuxent once their original sentences have been reimposed and to continue to have the opportunity for early, unconditional release from state custody. We think that this change is an ameliorative one that actually improves the position of inmates confined to Patuxent.

12

ued to make its yearly review of the Patuxent inmates. <u>See</u> Md. Code Ann., Correctional Services § 4-302(d) (1999). The IBR retained the discretion, based upon yearly reviews, to grant a leave of absence or parole to a Patuxent inmate. <u>See</u> Md. Code Ann., Correctional Services §§ 4-303, 4-305 (1999). To be sure, the revisions eliminated § 13(f) of the pre-1977 statute. However, the post-1977 statute does provide inmates at Patuxent with a similar chance for early, unconditional release: The IBR can petition the inmate's sentencing court to suspend or vacate the inmate's remaining sentence after he successfully serves three years on parole without violating the terms of that parole. <u>See</u> Md. Code Ann., Correctional Services § 4-305(f). Of course, this recommendation does not follow a conclusion from the Board that an inmate has recovered from his status as a "defective delinquent." After all, under the 1977 revisions, the inmates at Patuxent are termed "eligible persons" instead of "defective delinquents." The recommendation does, however, follow the IBR's conclusion "that the individual is safe to be permanently released." <u>Id.</u> Because Walsh was confined as a "defective delinquent" specifically because he was "an actual danger to society" who should be treated until it was "reasonably safe for society to terminate the confinement and treatment," Md. Ann. Code art. 31 § 5 (1971), we are unconvinced that Walsh was deprived of the opportunity, during his years at Patuxent, to have a sentencing court decide that he should be unconditionally released once he was termed "cured" of his mental affliction -- regardless of the fact that the state stopped calling that affliction "defective delinquency."**13** Of course, once Walsh was transferred from

_____

**13** To be sure, a recommendation from the IBR that a Patuxent inmate should be unconditionally released from custody could not occur as frequently under the post-1977 statute as it could under the pre-1977 statute. The 1977 revisions required an inmate to serve three years on parole before the IBR could exercise its discretion to make such a recommendation. However, because Walsh maintains that he was deprived of all opportunities for early, unconditional release during his confinement at Patuxent, he obviously does not argue that the decrease in the frequency of the opportunities that he did have violated the <u>Ex Post Facto</u> Clause. In any event, such an argument would seem to be foreclosed by existing precedent. <u>See California Dep't of Corrections v. Morales</u>, 514 U.S. 499, 509 (1995) (holding that a decrease in the frequency of parole hearings did not violate the <u>Ex Post Facto</u> Clause because it did not increase the measure of punishment for the crimes of inmates); <u>Roller v. Gunn</u>, 107 F.3d 227, 235-36 (4th Cir. 1997) (same).

Patuxent to the DOC in 1990, the IBR no longer gave him the annual reviews from which a recommendation for early, unconditional release might have come. This fact does not constitute an ex post facto violation because Walsh would not have received those annual reviews under the pre-1977 statute once he had been transferred to the DOC.

In sum, we hold that the 1977 revisions to the Patuxent statute about which Walsh complains did not run afoul of the Ex Post Facto Clause.

III.

Walsh also contends that, in removing him from Patuxent, the state of Maryland deprived him of a state-created liberty interest in remaining at Patuxent and receiving its treatment programs instead of returning to the DOC that is protected by the Due Process Clause. According to Walsh, the pre-1977 statute entitled him to incarceration

_____

As noted earlier, under § 10 of the pre-1977 statute, an inmate who had served a period of confinement equal to two-thirds of his original sentence could petition his sentencing court for a review of his status as a "defective delinquent." See Md. Ann. Code art. 31B § 10(a) (1971). After a hearing, the inmate could either be recommitted to Patuxent, unconditionally released from custody, or returned to the DOC under his original sentence with credit for the time that he had spent in Patuxent. See id. To the extent that Walsh argues that the elimination of § 10 by the 1977 revisions constitutes a violation of the Ex Post Facto Clause, we disagree. Under the old § 10, Walsh could not have been eligible to file a petition until 2017, a date which will mark the forty-eighth year of his confinement. (Although Walsh's original sentence was imposed in 1970, his sentence starting running in November of 1969.) This review would have only occurred assuming that Walsh had not been transferred out of Patuxent or released before that date. Only pure conjecture of the sort rejected by Morales can support the contention that the elimination of the old § 10 increased the measure of Walsh's punishment because, had the pre-1977 statute never been revised, Walsh would have still been in Patuxent in 2017, and the sentencing court would have determined that he was no longer a "defective delinquent" and should be unconditionally released.

14

and treatment at Patuxent until he was pronounced to no longer be a "defective delinquent." In 1990, he was declared no longer to be an "eligible person," a term that, as noted above, has a slightly different meaning than the term "defective delinquent." Because he has not been declared to be "cured" of his status as a "defective delinquent," Walsh argues that removing him from Patuxent deprived him of his liberty interest. Because Walsh did not have a state-created liberty interest in remaining at Patuxent and receiving treatment there instead of returning to the DOC, this argument fails.

To the extent that Walsh looks to the language of the 1977 statute in an attempt to find a liberty interest in remaining at Patuxent and receiving its treatment programs, he is looking in the wrong place. To be sure, the Supreme Court has "recognize[d] that States may under certain circumstances create liberty interests which are protected by the Due Process Clause." Sandin v. Conner, 515 U.S. 472, 483-84 (1995). In the same opinion, however, the Court rejected the idea that courts should look to the language of prison guidelines in order "to determine whether mandatory language and substantive predicates created an enforceable expectation that the State would produce a particular outcome with respect to the prisoner's conditions of confinement." Id. at 481. Instead, courts are to look to the nature of the deprivation suffered by an inmate and to remember that the liberty interests a state creates

> will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

Id. at 484 (internal citations omitted). Thus, the relevant question in regard to whether a state's change of a prisoner's conditions of confinement deprives that prisoner of a state-created liberty interest is whether the change "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."**14** Id.;

_____

**14** In Sandin, the Court specifically rejected the approach of combing through prison guidelines in search of mandatory language that it had

15

accord Beverati v. Smith, 120 F.3d 500, 503 (4th Cir. 1997). In addressing this question, our standard of review is de novo. See id. at 503 (4th Cir. 1997).

In both Sandin and Beverati, inmates complained that their removal from the general prison population and placement in disciplinary or administrative segregation deprived them of a state-created liberty interest. See Sandin, 509 U.S. at 476; Beverati, 120 F.3d at 502. In rejecting these claims, the Sandin and Beverati Courts compared the conditions that the inmates faced in administrative or disciplinary segregation with those faced by inmates in the general prison population and found that the difference in conditions did not present an atypical or significant hardship for the inmates. See Sandin, 519 U.S. at 486; Beverati, 120 F.3d at 503-04. In Sandin, the Supreme Court noted that, although the disciplinary segregation of Conner, the inmate, was punitive, it did "not present a dramatic departure from the basic conditions of Conner's . . . sentence." Sandin , 519 U.S. at 485. Similarly, in Beverati, our determination that administrative segregation did not present an atypical or significant hardship involved using the incidents of prison life that flowed from the inmates' original sentences as a baseline for comparison with conditions in administrative segregation. See Beverati, 120 F.3d at 503.

In this case, Walsh's original sentence was for a seventy-two-year period of incarceration in the DOC. Despite his arguments to the con-

_____

earlier adopted in Hewitt v. Helms, 459 U.S. 460 (1983). The Hewitt approach, the Court found, had two negative consequences. First, it discouraged states from codifying prison guidelines in order to avoid inadvertently creating a liberty interest. See Sandin, 515 U.S. at 482. Second, the Hewitt approach led to the federal courts' involvement in the day-to-day management of prisons. See id. Significantly, Walsh all but ignores the Sandin decision, instead relying upon Hewitt in his attempt to comb through the language of the Patuxent statute in order to advance the claim that he had a state-created liberty interest in remaining at Patuxent and receiving its treatment programs. We note that the Maryland case to which Walsh turns in support of his argument that inmates have a state-created liberty interest in remaining at Patuxent that is protected by the Due Process Clause, Angell v. Henneberry, 607 A.2d 590 (Md. Ct. Spec. App. 1992), was decided before Sandin and thus relied upon the Hewitt approach in order to hold that inmates have such an interest. See id. at 597-98.

16

trary, commitment to Patuxent did not form part of the basic condition of his original sentence because the pre-1977 statute certainly did not guarantee all convicted defendants admission to Patuxent. Walsh makes the assertion, uncontested by Appellees, that his sentencing court recommended, as part of his plea agreement, that he be referred to the staff of Patuxent for examination. Assuming the truth of this assertion, we note that the sentencing court could not promise actual admission to Patuxent. If the Patuxent staff determined that an inmate was not a "defective delinquent," that inmate would be denied admission to Patuxent. See Md. Ann. Code art. 31B§ 7(a) (1971). Thus, we think it correct to say that, at the time of Walsh's conviction, the basic condition of his sentence most relevant to our analysis is that he would serve a seventy-two-year sentence in the DOC.

Walsh complains that, in removing him from Patuxent and placing him in the DOC, the state of Maryland deprived him of a state-created liberty interest. We find, however, that Maryland simply returned Walsh to the basic conditions of his original sentence. Obviously, the incidents of prison life that Walsh faced upon his return to the DOC in 1990 are the same incidents of prison life that he would have faced had he never been sent to Patuxent, and comparing these identical incidents cannot possibly result in our finding that Walsh suffered an atypical or significant hardship in relation to the ordinary incidents of prison life. See Asquith v. Department of Corrections, 186 F.3d 407, 412 (3d Cir. 1999) ("Since an inmate is normally incarcerated in prison, Asquith's return to prison [from institutional confinement in a halfway house] did not impose atypical and significant hardship on him in relation to the ordinary incidents of prison life and, therefore, did not deprive him of a protected liberty interest."); Griffin v. Vaughn, 112 F.3d 703, 706 (3d Cir. 1997) ("[T]he baseline for determining what is `atypical and significant' -- the `ordinary incidents of prison life' -- is ascertained by what a sentenced inmate may reasonably expect to encounter as a result of his or her conviction in accordance with due process of law."); Callender v. Sioux City Residential Treatment Facility, 88 F.3d 666, 669 (8th Cir. 1996) (holding that removing an inmate from a work-release program and returning him to prison did not, under Sandin, deprive the inmate of a liberty interest because prison was "not atypical of what inmates have to endure in daily prison life."). Because we agree with the district court that

17

Walsh was deprived of no state-created liberty interest, his due process claim must fail.

IV.

For the foregoing reasons, the decision of the district court to deny Walsh a writ of habeas corpus is affirmed.

AFFIRMED

18