# United States Court of Appeals
## For the First Circuit

No. 05-1046

JAMES SKINNER,

Plaintiff, Appellant,

v.

MICHAEL CUNNINGHAM, WARDEN,
NEW HAMPSHIRE STATE PRISON, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]
[Hon. Joseph A. DiClerico, U.S. District Judge]

Before

Boudin, Chief Judge,

Torruella and Dyk,[*] Circuit Judges.

Michael J. Sheehan for appellant.
Nancy J. Smith, Senior Assistant Attorney General, Civil
Bureau, with whom Kelly A. Ayotte, Attorney General, was on brief
for appellees Michael J. Cunningham, Arthur Locke, John Kovacs,
Timothy Kenney, Sean McLeod, Neil Smith, Scott Dodge and Raymond
Guimond.

November 23, 2005

[*]Of the Federal Circuit, sitting by designation.

**BOUDIN**, <u>Chief Judge</u>. James Skinner, currently serving a life sentence, appeals from the district court's grant of summary judgment against him on two constitutional claims in his civil suit against prison authorities. We recite the facts in the light most favorable to Skinner, the nonmovant here. <u>Landrau-Romero</u> v. <u>Banco Popular de Puerto Rico</u>, 212 F.3d 607, 611 (1st Cir. 2000).

Skinner, a Massachusetts inmate serving a sentence for murder, was transferred to the New Hampshire State Prison on May 27, 1998, after being involved in a series of violent incidents in the Massachusetts penal system. Classified as a high-security prisoner, Skinner was housed in the prison's Special Housing Unit. On July 24, 1998, Skinner was involved in a fight started by another inmate, Eric Balagot, which resulted in Balagot's death. Skinner was immediately transferred to N-Tier, a restricted area of the prison reserved for "special circumstances."

Skinner was held in N-Tier for forty days. In N-Tier, he was isolated from the other inmates; his only human contact was when the staff opened the door for hourly checks or to deliver food. According to Skinner, the staff intentionally slammed his metal cell door during such checks, depriving him of sleep. The lights were on at all hours of the day. Skinner had nothing in his cell besides clothes and bedding, and he was permitted to leave his cell only to shower.

-2-

On August 5, 1998, a disciplinary charge was filed against Skinner for the incident leading to Balagot's death. Although a disciplinary hearing was set for August 19, a prison hearings officer (Ray Guimond) suspended the proceeding because the state intended to charge Skinner with murder. In early September, Skinner was returned to normal confinement. Because Skinner was eventually acquitted of murdering Balagot after a jury trial, the disciplinary proceeding never occurred, and Skinner was eventually transferred back to Massachusetts in 2000.

On May 15, 2000, Skinner brought the present suit in the federal district court in New Hampshire, charging a number of the prison officials there with violating his civil rights. 42 U.S.C. § 1983 (2000). The charges fell into three categories:

> (1) that the authorities had violated Skinner's rights under the Eighth Amendment's cruel and unusual punishment clause by exposing him to an attack by Balagot, who was a white supremacist (Skinner is black);
>
> (2) that Skinner's right to due process had been violated by confining him in N-Tier for forty days without a hearing; and
>
> (3) that he had been subject to cruel and unusual punishment by abusive treatment during three forcible "cell extractions" and by other acts of harassment.

On the first claim, a trial was later conducted and the jury held for the defendants. On the second and third claims, the district judge granted summary judgment for the defendants, and it is these latter rulings that Skinner now appeals. Our review of a

-3-

district court's order of summary judgment is de novo, and we "constru[e] the record in the light most favorable to the nonmovant and resolv[e] all reasonable inferences in that party's favor." Landrau-Romero, 212 F.3d at 611.

Skinner's due process claim, which we consider first, raises a difficult issue, but one entirely legal in character. That Skinner was moved immediately to N-Tier after Balagot's death, with no hearing or other process whatsoever, gives rise to no claim under the due process clause. Skinner had just killed another inmate, and whoever might prove to be at fault, the authorities were entitled to isolate Skinner on a summary basis--for his own sake and for the protection of others--while investigating the circumstances.

Due process, even where it is due, does not invariably mean process before the fact. A warrantless arrest for a felony is a classic example. Skinner was already in custody; the circumstances were exigent; and his immediate transfer to N-Tier was proper. Cf. Reardon v. United States, 947 F.2d 1509, 1522 (1st Cir. 1991) (en banc) ("The absence of notice and a hearing may be justified by exigent circumstances."). Skinner's main, and more colorable, due process grievance is that he was kept in N-Tier for forty days while his disciplinary hearing was indefinitely deferred.

Although Skinner's brief focuses on the deferral of the disciplinary hearing, the fact that the Attorney General was investigating with a view toward murder charges was a perfectly good reason for avoiding a duplicative inquiry. The better version of Skinner's claim is an argument that it was constitutionally unfair to keep Skinner for forty days in N-Tier's standard conditions without "some kind of hearing." See Wolff v. McDonnell, 418 U.S. 539, 557-58 (1974). More precisely, the question is whether Skinner was deprived of "liberty" without "due process of law."

This in turn poses two different questions: (1) how to define the "liberty" interest, which on a straightforward reading of the due process clause is a condition of due process protection ("nor shall any State deprive any person of life, liberty, or property, without due process of law," U.S. Const. amend. XIV, § 1); and (2) what kind of process is due, even where "liberty" is at stake, in the peculiar context of prison administration, where dangerous conditions exist and prisoner liberty is already limited.

The history of the Supreme Court's oscillations on both issues is candidly traced in the governing opinion, Sandin v. Conner, 515 U.S. 472 (1995), itself a 5-to-4 decision. There, the Court held that no due process denial could be made out unless the change in conditions imposed on the prisoner "atypical and significant hardship" departing from the ordinary conditions of

prison life.  Id. at 484.  Of course, such a hardship does not mean a violation: it is merely the precondition for a due process hearing.  The Supreme Court's phrase has now (inevitably) become a touchstone for the lower federal courts.  In this case, the district court ruled that Skinner's confinement did not meet this test of "atypical and significant hardship."

The hardship test has itself become the source of major disagreement.  See Wilkinson v. Austin, 125 S. Ct. 2384, 2394 (2005).  Some circuits compare the confinement conditions to those of the general prison population, while others look to the conditions of nondisciplinary administrative segregation.[1]  One circuit holds that disciplinary segregation never implicates a liberty interest unless it lengthens a sentence.  Carson v. Johnson, 112 F.3d 818, 821 (5th Cir. 1997).  Whether Sandin should be read as a cookbook recipe for all cases is unclear.

We think it is enough here that Skinner's segregation was rational, that its duration was not excessive, and that the central condition--isolation from other prisoners--was essential to its

---

[1]Compare Beverati v. Smith, 120 F.3d 500, 504 (4th Cir. 1997) (adopting the former view); Keenan v. Hall, 83 F.3d 1083, 1089 (9th Cir. 1996) (same), with Griffin v. Vaughn, 112 F.3d 703, 708 (3d Cir. 1997) (adopting the latter view); Wagner v. Hanks, 128 F.3d 1173, 1175 (7th Cir. 1997) (looking to the conditions of administrative segregation at the state's highest security prison). See also Hatch v. District of Columbia, 184 F.3d 846, 856 (D.C. Cir. 1999) (looking to the most restrictive conditions of administrative confinement that prison officials "routinely impose on inmates serving similar sentences").

purpose. Skinner was a prisoner serving a sentence for murder who had just killed another inmate. It made perfect sense to isolate him pending further investigation. Indeed, had he been returned immediately to the general population and had Skinner then attacked some other prisoner, or been attacked himself, a different and far more plausible suit against the authorities would likely have followed. Farmer v. Brennan, 511 U.S. 825, 828 (1994). The prison was waiting on the Attorney General, and six weeks is hardly an excessive time to conduct a preliminary inquiry into a possible murder.[2]

As for Skinner's conditions of confinement, isolation from other prisoners was of the essence, and while it was perhaps needless to have denied Skinner amenities such as television or books, these deprivations are largely incidental to Skinner's main complaint, and were in any case short-term. Taking all the circumstances into account, including the prison's need to manage its own administration, see Sandin, 515 U.S. at 482-83, Skinner's temporary isolation without a formal hearing was not unconstitutional either in its essential character or in its duration.

---

[2]Compare Sandin, 515 U.S. at 486 (finding no implicated liberty interest in being placed in disciplinary segregation for thirty days); Sealey v. Giltner, 197 F.3d 578, 589 (2d Cir. 1999) (same holding for 101 days of administrative segregation); Beverati, 120 F.3d at 504 (same holding for six months of administrative segregation).

The contrast with <u>Wilkinson</u>, the Supreme Court's most recent decision, is vivid. The Court there found that due process was required for a prisoner's placement in a super-max prison. It stressed that "[u]nlike the 30-day placement in <u>Sandin</u>, placement [at the super-max prison] is indefinite," <u>Wilkinson</u>, 125 S. Ct. at 2394. The Court also noted "that placement [in the super-max prison] disqualifies an otherwise eligible inmate for parole consideration," <u>id.</u> at 2395, thus potentially extending the length of incarceration. The differences between the present case and <u>Wilkinson</u> could not be clearer.

The district court's dismissal of Skinner's final set of claims would be a close call in the ordinary case. Skinner alleged that the defendants had violated the Eighth Amendment, primarily by excessive force used during the three cell extractions and secondarily by other acts of harassment, like the slamming of his cell door. The district court ruled that there was no case for a jury, that is, that no rational jury could find excessive force. Our review is again <u>de novo</u>. <u>Landrau-Romero</u>, 212 F.3d at 611.

The framework for analyzing such claims was set forth by the Supreme Court in <u>Whitley</u> v. <u>Albers</u>, 475 U.S. 312 (1986), and <u>Hudson</u> v. <u>McMillian</u>, 503 U.S. 1 (1992). Generally speaking, "[a]fter incarceration, only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." <u>Whitley</u>, 475 U.S. at 319 (internal

-8-

quotation marks omitted).  The critical question in such a case is whether the force was applied "maliciously and sadistically for the very purpose of causing harm," id. at 320-21, rather than "in a good-faith effort to maintain or restore discipline." Hudson, 503 U.S. at 7.

The cell extractions, which occurred on June 22, 1999, July 6, 1999, and March 24, 2000, all involved officers entering Skinner's cell, forcibly seizing him, and removing him from the cell.  The first occurred after Skinner had placed a sheet across his cell door and refused to remove it; the second after he refused to be handcuffed so his cell could be searched; the third after he threw food at one of the staff.  Extractions are apparently a formalized process; each of the extractions was videotaped, which makes this case unusual because we can see what occurred.

In each case, Skinner physically resisted removal and guards struggled to subdue him and remove him from the cell. Although Skinner offers extenuating explanations for his own conduct, what matters here is whether a jury could reasonably find that he was harmed through deliberate or wanton force unnecessary to his removal. See Hudson, 503 U.S. at 7.  The details of each extraction are set forth in the district court's decision on summary judgment.  It is sufficient to describe the third extraction, which represents Skinner's strongest case.

In this incident, after Skinner threw food, officers decided to move him to a different cell, but Skinner refused to extend his hands through the slot in the door so that handcuffs could be applied prior to the move. After warnings, the extraction team sprayed a non-lethal chemical irritant (derived from cayenne pepper) into the cell to make Skinner exit the cell without direct physical force; but Skinner continued to resist, remaining in the cell despite the spray. The move team then entered the cell, pushed him to the ground, handcuffed him, and carried him out.

Skinner says that as he was being carried along outside the cell, he was punched in the face and his eyes, ears, neck and throat were gouged and raked. A medical report from Concord Hospital prepared two days later said that Skinner suffered from a sore shoulder, wrist abrasions and "blunt trauma" to his eyes, but had "no evidence of injury to his head" and would be treated with Tylenol. Skinner identified Officer Dodge as the one who bruised his eye.

Dodge's affidavit states that Dodge opened the cell door, but that other officers were the ones who wrestled Skinner to the ground and carried him out and down the corridor in a prone position; Dodge says that he helped in the carriage by supporting Skinner's head to prevent it from striking the ground or a hard surface, lost his grip on occasion in the crowded struggle, but

-10-

never touched Skinner's eyes or deliberately sought to hurt him in any way.

After describing Skinner's strength, repeated refusals to "cuff up," and physical resistance to the officers, the district judge addressed the third extraction thusly:

> During the third extraction, Skinner claims his throat was improperly held and his eyes were poked. Even assuming that this occurred, there is no evidence to demonstrate that during the chaos he created, defendants maliciously injured him. In addition, as the video exhibit demonstrates, the officers were very aware of how they were holding Skinner's head and repeatedly instructed one another to support his neck. . . . There is simply no evidence that any defendant acted "maliciously or sadistically for the very purpose of causing harm." See Hudson, 503 U.S. at 6.

We have viewed the video ourselves. The chaos in the third episode (as in the other two) is wholly of Skinner's making. There are repeated warnings by the officer in charge to protect Skinner's head from injury. At one point in the third episode, Skinner yells that he has been poked in the eye; a voice promises him immediate medical attention as soon as the move is completed.

There is no evidence in the video or elsewhere that Dodge deliberately struck Skinner or that any of the other guards deliberately injured Skinner. Skinner's own affidavit does not provide such evidence. It concedes that "one may suffer bumps and bruises during a cell extraction," and alleges only that "the gouging of my face can only be the result of intentional gouging."

Thus, his affidavit does no more than _infer_ that no one could have gouged his face by accident; but given the crowding and struggle, it is hard to see this as proof. On this evidence, no reasonable jury could find that Skinner's injury, such as it was, resulted from cruelty or deliberate infliction of pain.[3]

Mentioned more tersely in Skinner's brief are many other acts of alleged harassment following Balagot's death (although curiously there is no explanation why Balagot's death should have prompted reprisals by prison officers). These alleged acts include the (earlier mentioned) slamming of Skinner's cell door, threats, discourtesies, epithets, and false charges on petty matters. If Skinner's account is credited even in part, this is a sorry story of mis-administration by the prison.

But such a collection of grievances does not amount to an Eighth Amendment violation, which in the conditions-of-confinement context requires "[e]xtreme deprivations." _Hudson_, 503 U.S. at 9. Whether there might have been judicial remedies in state court is a different matter. Skinner's brief, otherwise quite effective, mentions these grievances without making a serious effort to develop them; his claim is therefore forfeit. _Mass. Sch. of Law at Andover, Inc._ v. _Am. Bar Ass'n_, 142 F.3d 26, 43 (1st Cir. 1998).

---

[3]Although Skinner does not mention this in his argument, Dodge had complained in earlier incidents that Skinner had thrown coffee at him and sought to bite him, which might support a malicious motive; but Skinner himself had denied both incidents, undercutting their value to him now.

The judgment of the district court is <u>affirmed</u>. Each side shall bear its own costs on this appeal.